## Case No. 16,843.

### VANDERSLICE v. The SUPERIOR.

[2 Am. Law J. (N. S.) 347: 4 Pa. Law J. Rep. 388; 13 Law Rep. 399.]

District Court, E. D. Pennsylvania. Feb., 1850.

TOWAGE—EXTENT OF TUG'S LIABILITY—NOTICE OF RESTRICTIONS.

1. Considerations stated by Kane, District Judge, for holding a steam tug to the rigid accountability of a common carrier, in opposition to the case in 3 Hill, 9.

[Cited in Nelson v. The Goliah, Case No. 10,106; Brawley v. The Jim Watson, Id. 1,817; The Thomas Kiley, Id. 13,925.]

[Cited in Wright v. Gaff, 6 Ind. 422.]

2. The captain of a steam tug is the pilot of the voyage, and is the best judge of the sufficiency of the canal boat taken in tow, to resist the weather, and of the adequacy of her crew to do what may be required for her protection, and cannot limit his responsibility by a notice, given at the time of commencing the voyage, that it must be at the risk of the canal boat.

3. The steam tug, notwithstanding such notice, is bound for the exercise of all that skill and care which the circumstances of the case demand.

In admiralty.

KANE, District Judge. The steamer Superior was customarily employed by the Philadelphia and Havre de Grace Steam Towboat Company in towing vessels for hire between Philadelphia and the Delaware outlet of the Chesapeake and Delaware Canal. On the 15th of March, 1846, Captain Metz, her commander, was applied to by the libellant, to tow his canal boat, the Judge Roger, then laden with a valuable cargo, down the river. Captain Metz objected, alleging that the state of the weather was such as to make the trip a hazardous one; but being pressed by the libellant and several other masters of canal boats which were in waiting, he finally consented to take them, saying at the same time that "the weather was unfit to go down the river that day, and that if they must and would go down, they must do so on their own responsibility," or "at their own risk." Three of the canal boats were thereupon attached to the sides of the steamer; but one of them meeting with an accident immediately after, two only proceeded. Of these, one was very soon cast off at the request of her captain; thus leaving only the boat of the libellant, who persisted in his purpose to go on. They had not however made much progress before it was deemed prudent to detach the Judge Roger from the side of the steamer, and to tow her astern. In doing so, the canal boat got into the trough of the sea, and rolled so heavily as to lose some casks of merchandize, that made part of her deck load; and it was then agreed that she should be run in upon the mud flats on the Pennsylvania side above the pier at the Greenwich Point house, where it was thought she might take the shore safely. It was ebb-tide, and the wind was blowing hard from the Jersey shore. The

manœuvre of casting off the canal boat was executed badly on one side or the other, and she struck against the pier with so much violence as to damage her greatly. She succeeded, however, in anchoring a short distance below; when the steamer, returning either for the purpose of rendering assistance, or of receiving the towline which had been left fast to the canal boat, came into collision with her so forcibly as to break several of her own paddle wheels, and further to injure the canal boat in a greater or less degree. After this the steamer again took her in tow conducting her in a nearly sinking state towards the Jersey shore; and having almost reached it, she again cast her off, and directed her course for Philadelphia. But the depth of the water and the adverse wind and probably also the condition of the canal boat prevented the libellant from beaching his boat by means of poles, and she in consequence drifted out into the stream. The steamer returned upon observing this; but again coming into collision with her broke into her stern and completed her wreck. The boat sank, her hatches came off, part of her cargo drifted out, and nearly if not quite all of the remainder was damaged. I believe that there is no dispute upon the facts which I have recapitulated. The discrepancies in the testimony relate to the sea-worthiness of the canal boat at the time of leaving Philadelphia, and the degree of skill and care displayed by the steamer in the subsequent incidents.

The libellant claims indemnity for the damage done to his boat and her cargo by these repeated collisions. He considers the steamer as in the occupation of a common carrier, and liable for all losses which have not been occasioned by the act of God, or of public enemies; and he denies that the limitation by the captain of his responsibility, by the notice to the libellant, if admissible at all, can be so extended as to exempt him from liability under the circumstances presented by the evidence. For he says in the second place, that the loss was directly occasioned by a want of that ordinary skill and care on the part of the steamer which are engaged by every carrier of goods for hire. The claimants, the towboat company, deny that they are common carriers; and assert that being ordinary bailees, bound as such by force of the ordinary contract only to the exercise of ordinary care and skill, their special disclaimer of responsibility, impliedly acceded to by the libellant at the time of contract, must be construed as exempting them from liability for everything except just that measure of skill and care which would be exacted by the circumstances of a voyage which involved no special or extraordinary hazards. They affirm that they did exercise this measure of skill and care; that the collision of the canal boat against the pier was occasioned by her being insufficiently manned; and that, as to the two subsequent collisions,

they must be referred to the state of the weather, and were, moreover, in their consequences of no importance, since the first collision had reduced the canal boat to a state of wreck.

The first question thus presented is: Whether steam tugs, whose regular and constant business it is to tow boats for hire, are to be regarded as common carriers, when the owner or master of the boat towed remains on board of it. Chancellor Kent, in his Commentaries (vol. 2, 599), includes them in this class of bailees, but cites no authority for the position. On the other hand, Judge Story excludes them from it (Bailments, § 496), referring in the margin to the case of Alexander v. Greene, 3 Hill, 9. I confess that, after reading that case over carefully, the reasoning of the court does not appear to me conclusive, and that I am much more impressed by the argument of the counsel for the unsuccessful party. It has been suggested, that such steam tugs should perhaps hold a place between common carriers and ordinary bailees for the carriage of goods; not liable in general for loss by fire or robbery, since the owner or his immediate agent has to a certain extent the continued supervision of his property, but to be otherwise held to the highest degree of accountability, since the vessel towed is for the time under their control—quite as much so as the baggage of a passenger in a stage coach. But, if they are not to form a distinct new category, I should be strongly inclined to the opinion that they must be treated as common carriers. Their occupation is essentially a public one—they hold themselves out to the world as ready to serve all who will employ them, and they have whatever of advantage any common carrier can derive from such a public announcement. They have the custody and direction of the vessel to be transported: it is generally fastened to the steamer in such a manner as not to be safely detached while the two are in motion, unless by the act of those on board the steamer; and if detached while on the way, the boat is without any power of providing for her safety. The hands on board the boat, moreover, receive their orders from the steamer's captain—and in fact the two move on together under the sole impulse and guidance of the steamer. The vast interests, which are daily confided to such steam tugs, the hazards to which our internal commerce may be subjected by a want of the highest degree of skill and care on the part of those who command them, and the difficulty of drawing the line in a court of justice between the consequences of mismanagement and those of mere stress of weather, or, where these come together, as they often do, of assigning to each its appropriate share of influence;—these considerations urge us very strongly to hold the steam tug to the rigid accountability of a common carrier. But I do not think it necessary to decide the question. Though the law of

Pennsylvania under which this contract was made, seems to be settled by the supreme court of the state, however reluctantly, that a common carrier may restrict his common law liability by special contract; yet the extent to which such a limitation may go is itself limited very strictly. It has never been contended, that the limitations can be so enlarged as to relieve him from the exercise of all ordinary skill, diligence and care. The utmost, for which he has ever been allowed to stipulate, is that his liability should be subject to the same rules as that of an ordinary bailee for hire. What then was the liability of the steamer, considered as an ordinary bailee, who, at the time of contracting, had given to the master of the canal boat the special notice which is in proof? Independent of that notice the engagement was for the exercise of adequate skill, and of reasonable care and prudence in towing the boat to her destination,—skill and prudence, both adapted to the circumstances, hazardous or otherwise. Did the notice vary this engagement?

In the case of Alexander v. Greene, already referred to, it was decided that an engagement to tow a boat "at the risk of the master and owners thereof" relieved the steam tug from all liabilities arising from a want of ordinary care and skill; and it has been contended here with great force, that the notice by Captain Metz that if the canal boat determined to go, it must be on her own responsibility or at her own risk, should have an equally broad effect. I acknowledge that I cannot distinguish the two forms of expression, so as to give them a difference of import. But I have not been able to satisfy myself, that the notice in either case should have the effect contended for. I cannot conceive of a contract for transportation, which shall be so limited, as to exonerate the carrier, when the property entrusted to him is destroyed by his negligence or want of skill. Such a contract would have no meritorious consideration: its terms involve no engagement at all: it means nothing. but that the carrier will not fraudulently or wilfully destroy the property; and to this every man, whether carrier or not, is bound by the law of the land, in reference to the property of every other man, without any contract whatever. In my judgment a saving of this sort would be repugnant to the spirit and purpose. as well as the body of the contract; and, were such an interpretation claimed for the notice in this case, I could not regard it otherwise than as void. Such I may remark, seems to be the opinion also of the accomplished editor of the American Leading Cases, in his comments on this decision. But the claimants here do not assert this doctrine without qualification. They admit themselves bound for the reasonable skill and diligence which would be adequate to an ordinary risk; and only ask exemption from employing that higher skill and diligence which

the particular emergency in this case called for. Still I cannot accede to the legal policy which would sustain even such a limitation. It could never have a practical interpretation. What is its import? Does it mean that if in consequence of the storm the captain of the steamer shall become too much absorbed in anxiety for his own safety to think of any thing else, this shall be enough to discharge him and his steamer from liability? Does it mean that he may cast off his tow to the mercy of the elements, so soon as he becomes sensible that his own risk is increased by keeping it attached? His own safety, and the safety of his tow would no doubt have been more complete. if neither had left the wharf at Philadelphia; now, what increase of peril, beyond that of encountering the elements at all, shall be deemed the casus fœderis, which is to excuse his negligence or want of skill in meeting it! And how are we to subdivide and distribute the indicia of nautical skill and prudence, so as to mete out to the vessel under tow its just portion of them in the varying contingencies of such a voyage!—asserting for it all that would be needed in favorable weather, but denying its right to any more?—distinguishing circumstances into ordinary and peculiar, that differ only by inappreciable degrees, as the height of a wave, or the force with which the wind blows, and referring the injury which is complained of to one or the other class of causes; thus ascertaining whether the peril was within the contract or its limitation?

How shall we decide in reference to a particular case of peril or difficulty, that it called for extraordinary energies, but that the energies that combated it were merely ordinary! It involves no hardship to the master or proprietor of a steamer, whose daily occupation is the navigation of the river. to assume that he is acquainted with its hazards, and fitted to decide whether the state of the wind and tide will allow him to carry down his train of canal boats in safety. He is the pilot of the voyage: he is the best judge even of the sufficiency of the canal boat to resist the weather, and of the adequacy of her crew to do what may be required for her protection. It is in evidence that when the water is smooth, and the tow boats are attached in consequence to the steamer's guards. the hands of the tow boats have nothing to do,—that boats have occasionally been towed in safety without any person on board,—at other times, when the boat is towed astern, a man is required to steer her, and a boy or another man to give occasional assistance. Sometimes a still larger crew may be required by circumstances. Again, the form, dimensions, and lading of the tow boat have their influence. A decked boat with a light cargo is perfectly safe in weather which would swamp an open boat, heavily laden. Now, when a boat offers herself for towage, it is the proper office of the master of the steam-tug to determine upon all these points, and to refuse

to take her if she is either too imperfect in her structure and arrangements, too heavily burthened, or too lightly manned to meet the apparent hazards of the particular voyage. He would have this right, whether regarded as a common carrier or as an ordinary bailee; and I see no objection to requiring that he shall exercise it. I am inclined, therefore, to decide that the limitation of the claimants' liability, which has been contended for, does not exist; and that the steam-tug, notwithstanding the notice, was bound for the exercise of all that skill and care which the circumstances of the case called for.

Did Captain Metz exercise this degree of skill and care? I have examined all the evidence in the case very fully and cautiously. There is in it just about the usual conflict of recollections that belongs to controversies of this sort. Men who are parties in a scuffle, or on board different ships that come into collision, never agree as to where the blame lies. Even lookers on very seldom unite in detailing occurrences of an exciting character. Especially is this true as to times, distances, and even as to the order in which incidents have followed each other. It is often in consequence the most puzzling duty of a judge, to determine from the conflicting evidence of honest and intelligent witnesses, what the truth is which they all profess to detail. In such a case he is fortunate if he can get hold of some fact independent of memory—some land mark that cannot have been subjected to change. I think we have something of this sort in a part of the evidence here. It is found in the position and course of the canal boat at the moment of striking the wharf, as determined by the part on which she received the first injury. She struck on her starboard bow: her head, therefore, was that moment inclined outwards to the river, and off from the flats. She struck, moreover, with great violence; so as not only to break in her bow, but to indent or displace the wharf-log against which she struck. I do not see how these two circumstances can be explained, unless by the supposition that at the moment of striking she was obeying a powerful impulse derived from the steamer. Now it is agreed on all hands, that the steamer and the canal boat were on the Jersey or weather side of the river, where it was determined that the boat should be cast off; that the steamer immediately directed her course towards the Pennsylvania shore, and reaching this side of the channel, passed immediately below the powder wharf, 562 feet above the place of the first accident, still steering towards the flats. Then inclining down stream in the cove between the powder wharf and the wharf at the Ferry, where the water was smooth, she skirted along the flats; the canal boat in the meantime steering towards the Pennsylvania shore. Arriving near the lower or Ferry wharf, the steamer again headed outwards towards the deep water; and it was about this time, or immediately after, that the canal boat struck the wharf. So far the witnesses concur. The witnesses for the steamer say, that soon after passing the powder wharf she slackened her speed, and at last checked it altogether for the purpose of enabling the canal boat to throw off the bow-rope; and that this would have been effected, if the crew of the canal boat had been effective; but that the libellant being at his helm, and no other person on board but a boy who was not strong enough to unhook the rope, the libellant left his helm to assist him, and thus occasioned the accident, though the steamer had in the meantime thrown loose her tow rope. Now, it is plain that this of itself would not have produced the collision. Had the steamer stopped in time, and the tow-rope been fully slackened, the canal boat would not have had sufficient headway to drive her against the wharf so forcibly; and her motion directed inwards by her helmsman, and aided by the wind, would have continued towards the shore, rather than outwards against wind and steerage. The story on the other side denies that the captain of the canal boat ever left his helm, and refers the injury to the continued speed of the steam boat, which kept the tow line taught until the boat was nearly in contact with the wharf, even while the steamer was heading out herself; and thus made it impossible for the boat to obey her helm. This view of the facts, which is borne out moreover by the testimony of those who witnessed the accident from the shore, seems to me to be fully corroborated, and I have already remarked by the force and direction of the boat's impact against the wharf. There are numerous facts disclosed in the depositions which point to the same conclusion. It is not necessary for me to refer to them in detail. I have been particularly struck by the reported difference in the bearing of the two captains: —the one excited, intimidated, losing his presence of mind, hurrying about his vessel, multiplying orders—twice bringing his steam boat into forcible collision with the sinking canal boat which he sought to rescue;—the other calm, resolute, efficient; endeavoring to secure his boat to the wharf by lines after the first accident; anchoring her when that failed; holding on to his chance of deliverance even after the steam boat had become entangled with her afterwards; refusing to quit his post when warned that she was bearing down on him the second time; and even after she had again struck him, and he was driven down in the water to his knees by the last collision, holding on to his vessel till he had made fast to her bow the line by which she was dragged ashore at last after she had sunk. In a question which involves the seamanship and prudence of these two men in the circumstances which led to the first accident, I am justified in referring to their subsequent conduct in the disasters which followed. I am constrained to say that the captain of the steam tug appears to have failed

in the performance of what I suppose to have been his duty. It was not enough that he shut off his steam when approaching the wharf; for this would only check without arresting the motion of his vessel; he was bound, in the exercise of ordinary care, even if the weather had been calm, to see to it that the rope was adequately slackened to allow the canal boat to get ashore; and if he found that from any cause the rope was not at once detached, he was bound to wait till it could be done; or if the wind and his position made it dangerous for him so to stop on his course, he should have retained his hold of her, carrying her out with him into the channel again, and repeating his manoeuvre at some lower point on the river. I fully acquit him of all wilful misconduct; but I cannot escape the conclusion, that had he been more self-possessed than he appears to have been; in a word, had he exercised the ordinary skill and prudence which his contract of bailment implied, the first accident never would have occurred. As to the two subsequent collisions, the argument for the claimants admits that they are without legal justification or excuse.

The preliminary questions which were raised upon the pleading, do not seem to me to involve a difficulty. The bailee of goods has such a property in them as will support a suit for damage done to them; and though the party damaged by a collision cannot in any case receive a double satisfaction, I do not see any reason for refusing him permission to include in the initiation of one proceeding his claim of recourse against the ship which has injured him, and against its owners to the extent of their interest in it. The decree will be in rem for the libellant for the amount of his actual loss by reason of the three collisions that have been referred to, with interest, in the nature of damages from the date of the occurrences, and with full costs. And it is referred to the commissioner to ascertain the amount of this decree.