# MARTIN WHITE *v.* STEAM-TUG MARY ANN.

Remedial statutes must be construed liberally, and where the meaning is doubtful, it must be so construed as to extend the remedy.

*It seems* that the towing a vessel out to sea by a steamer is the transportation of property so as to bring the case within the law of common carriers.

The fact that a vessel, lost while being towed out to sea, is insured, does not divest the owner of the right of action for damages for her loss, especially in the case of a mere partial insurance, for in such a case the abandonment by the owner only transfers his interest so far as that interest is covered by the policy.

A recovery by the owner in such an action will bar another action for the same cause, and therefore the defendant cannot raise the objection that the action is not brought by the real party in interest.

Whether a steam-tug is a common carrier or not, she holds herself out to the world for engagement in a business for hire, requiring prudence, skill, and the use of adequate means to perform the contracts which she undertakes, and this constitutes a stipulation of their existence; which, by clear construction, enters into the contract and forms a part of it.

The fact that the owner of the ship lost while being towed to sea, was the agent for the owners of the steam-tug, does not relieve the latter from any of the obligations under which they contract with others.

APPEAL from the District Court of the Twelth Judicial District.

Plaintiff brought his action against the steam-tug under the 317th section of the Practice Act, claiming damages under the following state of facts, as proved on trial. The Humboldt Lumber Manufacturing Co. appeared and defended as owners of defendant:

Defendant is a steam-tug owned by the Humboldt Lumber Manu-

Martin White *v.* Mary Ann.

facturing Company. Plaintiff's witnesses testified that defendant was used for the business of towing vessels for hire across the bar at Humboldt Bay, and that she was advertised to tow all vessels. The witnesses for defendant testified that the defendant was used by her owners in and about their business of sending lumber to market; that she never was advertised to tow all vessels; that she sometimes refused to tow vessels, and always charged $3 per 1000 feet for the lumber of other persons than her owners, while the lumber of her owners was towed at $2 per 1000; that all vessels not towing lumber of the Humboldt Lumber Manufacturing Company were obliged to make their respective contracts; that the towage paid was always per 1000 feet of lumber, and not by tonnage of vessel.

Plaintiff was the owner of the schooner " Sierra Nevada"—contracted with the Humboldt Lumber Manufacturing Company to carry from Humboldt Bay to San Francisco 130,000 feet of lumber belonging to the company, for which the company was to pay him $8 per 1000 feet, and to furnish the towage by their steam-tug, this defendant.

While the defendant was towing the plaintiff's schooner across the bar, the hawser by which the schooner was attached to the tug parted, and the plaintiff's schooner was lost.

Plaintiff proved that it was the defendant's custom to furnish a hawser for towing; that the defendant's captain was the sole judge of the fitness of the weather and other circumstances on the occasions of towing; and that the plaintiff's schooner, as was customary, was subject entirely to the orders and control of the captain of defendant.

Plaintiff was a stockholder in the Humboldt Lumber Manufacturing Company; was one of the trustees of the company, and Treasurer. One of defendant's witnesses proved that the president of the company had complained to the plaintiff of the condition of the hawser, and directed the plaintiff as treasurer of the company, to send up a new hawser. Witness did not distinctly remember when this was; thinks it was before the time of the loss.

As to the condition of the hawser, it was proven that it was old and much worn, but that it was the best hawser in the possession of the company; that it had parted twice before this occasion, but had been in constant use since the first parting; that the company had never had a hawser which had not parted; that after parting, a hawser was spliced and used again; that a hawser had never parted where it was spliced—is as strong at the spliced part as any other. This hawser was well known by the officers of the defendant to be old and in bad condition, and the engineer had once remonstrated against using it.

A witness for defendant testified that the plaintiff was frequently at Humboldt Bay and familiar with the condition and affairs of the company. And the captain of the defendant testified: " Capt. Smith (of plaintiff's schooner) was most certainly aware of the fact of the hawser parting with the Columbia. The circumstance of this parting was a topic of common conversation among the captains then in port. Capt. Smith did not make any objections to being towed out with this

hawser." Witness was asked, "Was he not willing and rather anxious to go and be towed out with this hawser?" Plaintiff objects, and witness answers "Yes. It is my common practice to inform captains of vessels if I have any fears of the sufficiency or safety of hawsers."

Benjamin Lyttle, on behalf of defendant, testified that he heard Capt. Smith say he was going out the next day "if Capt. Buhne (of the tug) would tow him out. He said Capt. Buhne was afraid the hawser would part; and if it did, he could put his helm about and come in again; that he had been here long enough, or something like that."

Capt. Smith, on re-examination, denied this conversation.

Defendant proved that plaintiff's schooner was insured for $5,000, her estimated value being $10,000—and payment in full by insurers to plaintiff.

On the trial, the Court, after refusing instructions asked for by defendant, directly the converse of the charge as given, charged the jury "that in rendering their verdict, they were not to consider the question of the plaintiff being a member and officer of the Humboldt Lumber Manufacturing Company, and knowing the condition of the hawser; nor were they to consider the question of abandonment by the plaintiff to the Insurance Company. These were questions which did not affect the liability of the defendant. The only point for them to consider, was as to the performance by the defendant of its contract of towage. If they found that the hawser was insufficient, the defendant was liable."

To these instructions defendant duly excepted. The jury found a verdict for the plaintiff. The defendant moved for a new trial, which was overruled, and defendant appealed.

*Whitcomb, Pringle & Felton,* for Appellant.

1. That the contract is not a contract for the transportation of persons or property within the meaning of the fifth clause of the 317th section of the Practice Act.

2. That the suit was not brought in the name of the real party in interest.

3. That the defendant, not being in the position of a common carrier, the extent of its liability must depend upon the nature of the contract, and the plaintiff, being part owner of the defendant, and familiar with the means employed in its ordinary business, must be held to have contracted with reference to those means, and was entitled only to the best use of those means.

4. That the plaintiff, having been one of the agents of the owners of the defendant in and about the management of its business, was not entitled to any exemption from what he knew to be the ordinary risks of that business, and must be held to have contracted with reference to those risks.

I. The words of the statute evidently refer only to the common carrier's contract, viz.: to that "*transportation*" which imposes the ex-

Martin White *v.* Mary Ann.

traordinary liability of the common carrier, because it requires an actual bodily taking and carrying, and therefore a complete possession in the carrier. Such is the ordinary use of the words " transportation of persons and property." They are not applicable to this towage service, which is in no proper sense of the word a " transportation "—it is the mere lending of additional force to the owner's conveyance—it is not accompanied by the complete possession which is essential to the common carrier's contract—it is not a bailment, because of the absence of such complete possession. The vessel transports the goods on board of her, but the tug that throws a hawser to the vessel and tows her along, cannot be said to transport the vessel. " Transportation" includes the idea of a bodily carrying—from the Latin "*porto*," as seen in the words " porterage " and " porter ;" which is quite distinct from the simple addition of new force where there is already power of motion.

That the framers of the statute had this distinction in view, is apparent, not only from the natural meaning of the words, as above, but also from the fact that the same distinction constantly occurs in the books, and the common carrier's " transportation " is constantly contrasted with this towage service.

Observe the use of the words and the distinction drawn in the following :

" The owners and masters of steamboats engaged in the *transportation* of goods for persons generally for hire are common carriers. The owners of a steamboat who undertake to tow freight boats for hire, or undertake to tow vessels in and out of port for hire, are not common carriers." Story on Bail., § 496.

" The owners of steamboats, when employed in the ordinary business of transporting goods, are liable to the full extent of common carriers, but when they are employed out of the course of such, their ordinary business, as in the instance of towing a freight vessel, the owners are held to no more than ordinary careful management, and the law of common carriers is not applicable to them." Angell, p. 673—see also ib., p. 91 ; and 1 Smith's Leading Cases, p. 269.

So, also, in Hermann *v.* Western Ma. and Fi. Ins. Co., 13 La., p. 523, Judge Eustis says : " The business of towing ships is entirely separate and distinct from all things connected with or incidental to the navigation of the river by steamboats, or the transportation of freight and passengers."

And, finally, the latest definition of the common carrier is by Chief Justice Parker, of Massachusetts : " He is one who undertakes for hire to transport the goods of such as choose to employ him, from place to place," which is quoted and endorsed by Parsons, in his recent work on Contracts, vol. 1, p. 639.

It is of some significance, too, that the statute of 1850, for which the present statute was substituted, was worded as follows : " Any contract touching the transportation of persons or property, entered into by the master, owner, agent, or consignee of the boat or vessel on which such contract is to be performed ;" thus clearly intending that ordinary freighting of goods, which we contend is the meaning of the word "transporta-

tion." It is true that the above words are not retained in the present statute, but the change has evidently been made for mere simplicity of language; there was no intention of altering the sense.

The common carrier is presumed to be liable for every loss of goods, because he takes them into his own exclusive possession beyond the reach of the owner, and where any fraud or negligence is apt to escape detection. The towing steamers, on the other hand, according to Bronson, J., in Wells *v.* Steam Nav. Co., 2 Comstock, p. 208, are not common carriers, or carriers of any kind, in relation to the business of towing boats. Nor are they bailees of any description, for the property towed is not delivered to them, nor placed within their exclusive custody or control, hence the presumption is not against them, as in the other case, and there is not the same reason or excuse for the severe remedy of the statute. See also Leonard *v.* Hendrickson, 18 Penn., 60.

Nor is it likely that this class of contracts is within the evils intended to be remedied by the statute. This towage service is performed by tug-boats that have a fixed and permanent towing ground, and not by vessels which, like birds of passage, are migratory and uncertain, whose owners may be anywhere.

II. The plaintiff was not the real party in interest. The abandonment to the insurers was a transfer to them of all right of action against the defendant. Such a transfer is implied in the very definition of the term "abandonment." See Emerson on Insurance, Meredith's ed., pp. 665–7 and 684; 2 Phil. on Insurance, § 170; Fretz *v.* Bull, 12 How., p. 466; Hart *et al. v.* West. R. R. Co., 13 Met., p. 100. It is impossible to escape from this ground of error.

The authorities seem to leave no room for argument. The case in 17 Howard, p. 156, appealed to by the respondent's counsel, clearly admits an equitable assignment to the insurers, which under our practice would make them the proper parties to bring this action.

" The insurer may at all times intervene in Courts of admiralty, if he has the equitable right to the whole or any part of the damages. Under the 34th rule in admiralty of this Court, he may be allowed to intervene and become the *dominus litis,* when he can show an abandonment which divests the original claimant of all interest." • 17 How., p. 156.

Whether the plaintiff has insured for the whole amount or not is immaterial. He sues here as sole owner and claimant.

Our Act, as amended, reads as follows : " Every action shall be prosecuted in the name of the real party in interest, except as otherwise provided in this Act," etc. See page 303 of Statutes of 1855.

The respondent's counsel seeks to escape this ground of error by contending that the plaintiff here is the " trustee of an express trust," under the 6th section of the Practice Act.

This is the ordinary case of an assignment of a chose in action, (which may be as well by parol as by deed,) and if this case is brought within the statute, no assignment of an unliquidated demand can ever operate to give to the assignee a right of action in his own name. There is no express trust here, unless the assignment shall be held to be

the expression of a trust, and if we hold *that,* we must hold always that the assignment of an unliquidated demand is the expression of a trust in favor of the assignee, which would be totally defeating the intention of the statute of 1855.

III. If the plaintiff was part owner of the defendant, and familiar with its manner of business, and was aware of the condition of the hawser, all these things enter into and influence the contract.

Under the rulings of the Court in this case, we are entitled to consider this as a mere hiring of service, as a contract for the diligent and skillful employment by the owners of the defendant, in the service of the plaintiff, of those means which the said owners were in the habit of employing in their own service. The plaintiff must take those means as he knew them always to have been; he was familiar with the risks of their employment, he knew that no exception was to be made in his favor, he asked for none, and he thereby consented to their employment, and now he cannot set up that such employment was negligence. He must abide by his own hiring.

It is true that ordinarily the " confidence induced by undertaking any service for another," is the consideration which creates a duty. 1 Smith, p. 254. But here there was no such confidence. There was confidence only in the skillful employment of those means which both the contracting parties had in view. Any negligence in the employment of those means would be fatal, but the use of them is not negligence.

It is familiar law that even in the carrier's contract, a particular custom as to storage, delivery, carriage, etc., makes an implied assent on the part of the bailor. 2 Kent, p. *592; Story on Bailments, p. 478; Gibson *v.* Culver, 17 Wend., p. 305, and in the great case of the Farmer's and Mechanic's Bank *v.* Champlain Transportation Co., 16 Verm., 52; 18 ib., 131; 23 ib., 186; 1 Parson on Contracts, 661.

And the defendant had a right to ask the jury whether as agent and part owner the plaintiff did not know the condition of the hawser to which he was entrusting his property, and did not therefore assent to the use of that hawser, and take its risks.

IV. Upon the analogy of Murray *v.* South Carolina R. R. Co., 1 McMullen, 398, and Brown *v.* Maxwell, 6 Hill, p. 594, we contend that if the plaintiff is one of the agents of the Humboldt Lumber Manufacturing Company, entrusted with the management of the defendant's business, he could not claim exemption from the risks which are incident to the employment of which he was part and parcel. In his own contract with the company, he must be held to have had in view those means which he had endorsed by his use and approval. He cannot charge that the use of those means was negligence.

*S. M. Bowman* for Respondent.

I. The first assignment of error is not good. The statute is plain. It gives the right of action against all steamers, vessels, and boats, for non-performance or mal-performance of any contract for the transportation of persons or property. Practice Act, ch. 6.

The defendant is most certainly either a steamer, vessel, or boat.    It was proved that her officers and owners contracted with the plaintiff for the transportation of the " Sierra Nevada."    They agreed to transport her from Eureka, a town on the Humboldt Bay, over the bar and out to sea.    The transported vessel was certainly property.    How, then, can it be said this case is not directly within the provisions of the statute ? Its language is plain, and its provisions cover any contract and every species of property.    And it can make no difference by what means, or in what manner, the transportation is effected; if it be merchandise, it will be taken on board and stowed away; if animals, they will be placed on deck.    But a vessel, to be transported, can neither be taken in the hold or on deck, and can only be transported by lashing along-side, or by towing with a hawser.    Yet, to move a vessel from one place to another by an agency applied for the purpose, is an act of transportation in the only possible way in which transportation can be effected of such property.    But it is argued, the word " trans-port" means literally to take up and carry, and we are referred to the origin of the word transport, to carry; and it is insisted there can be no such thing as transportation where the property is not capable of being taken into manual possession, and actually carried from one place to another.    But neither the dictionaries, nor the ordinary use of the English language, will sustain this argument.    Webster, under the word " transport," gives us the definition and illustration at the same time : "to remove from one place to another, as a ship, by means of hawsers and anchors."    On the Upper Mississippi river, they transport flat-boats, laden with goods, by lashing them alongside of steamboats, while the latter furnish the whole motive power, and are thus trans-ported hundreds of miles.    This is transportation in every sense of the word.    The law specifies no particular kind of transportation, but refers to all transportation, and the manner of the transportation and means used must depend on the nature of the property.

II. Nor is the appellant's second assignment good.    The insurance was on half the estimated value of the vessel.    The plaintiff was his own insurer for the other half.    Undoubtedly, the underwriters could have intervened for half the damages, but they did not so elect, nor did they give notice to the defendant of their claim, but stood by and allowed the suit to go on in the name of the plaintiff, preferring, no doubt, to adjust their interest after judgment, if the plaintiff should be successful.

This objection is disposed of in a lucid manner in the case of the propeller Monticello *v.* Mollison, 17 How. U. S. R., 155.

Phillips, in his able work on Insurance, II, page 708, § 2163, lays down the doctrine we contend for in its broadest extent, and cites, in support of his proposition, the cases of Yates *v.* White, 4 Bing. N. C., 272; 1 Arnold S. C. R., 85; 5 Scott, 640; which are the same cases referred to by the Court in 17 Howard.    Phillips says :

"Where the whole loss by collision of two vessels has been paid by the underwriters on one of them, and the owners of that one sue those

of the other, on account of the collision, the latter have no right, in determining the damage, to deduct the amount so paid by the insurers."

If it be true, as is contended for by appellant's counsel, that the abandonment of the lost vessel and adjustment of the policy with the insurance company, operates in law to an assignment of the entire claim for damages, so as to vest in the insurance company such claim, and to prevent the plaintiff from suing in his own name for the violation of the contract, then does the law strangely work most signal injustice in such cases. Suppose the damages to be $50,000, and the insurance $1,000; can it be that the injured party, by collecting his insurance, assigns his claim to the remaining $49,000?

But they say the plaintiff below could not, in any event, bring the suit in his own name; and read us section four of the Practice Act, as amended in 1854, which is in these words:

"Every action shall be prosecuted in the name of the real party in interest, except as otherwise provided in this Act."

But the contract was the plaintiff's contract made in his own name, which results in this case partly to the use of another party, and hence is within the provisions of a following section of the Practice Act.

§ 6. "An executor or administrator, or trustee of an express trust, or a person expressly authorized by statute, may sue without joining with him the person or persons for whose benefit the action is prosecuted. A trustee of an express trust within the meaning of this section shall be construed to include a person with whom, or in whose name, a contract is made for the benefit of another."

III. The third point made by appellant, assumes that the steam-tug is not a common carrier. This is not admitted. The steam-tug is a vessel recently invented, but subserves a most important purpose in carrying on the commerce of the world. Its ordinary employment is to tow vessels into harbor and out to sea. It is a public employment in which the owners transport property for reward, for the public.

Perhaps the best definition of a common carrier found in the books was given by Lord Holt: "He is one who exercises the business of carrying property as a public employment for persons generally, and holding himself out as ready to engage in the transportation of goods for hire as a business." Ang. on Com. Carriers, §§ 68, 69, 70.

It certainly can make no difference what the particular agency may be by which the transportation is effected, whether it is a stage-coach, a wagon, a railroad-car, a canal-boat, a ship, or a tug. These all vary according to the nature and character of each particular business, and the subject of the transportation. According to the proof, the defendant should be held to be a common carrier. In the case of Vanderslice *v.* Tow-boat Superior, 2 Amer. Law Journal, (N. S.) 347, referred to in note on p. 302 Flanders' Mar. Law, it was held by Judge Kane, that the defendant was a common carrier.

The leading case cited against us is the case of Wells *v.* The Nav. Co., 5 Com. R., 204. But that case is not in point. The vessel in tow was a canal-boat, which was in all respects, except in the matter of

the towing, the mere *force* of the transportation, under the management of the men on the canal boat, and that, as a common carrier, the vessel in tow should be under the *exclusive* control of the towing vessel. In the case at bar, it was proved the defendant had the entire command, management and control of the " Sierra Nevada."

2. But it is not material whether the defendant was, or was not, a common carrier. If not, she was bailee for reward. It was, then, a case of *locatio rei*, and liable for slight neglect. 2 Kent, 751.

3. The law gives a member of a corporation the same rights and remedies against the corporation as other persons. There is no reason or justice in any other view. Angell on Cor., 391; Gray *v.* Portland Bank, 3 Met., 44.

This point came directly before the Court in Waring *v.* Catawba Co., 2 Bay R., 109, (South Car. R.,) in which the same plea was set up, which was overruled as subversive of justice.

Here the officers and owners of the tug undertook to perform a certain contract; they failed to perform it; the plaintiff suffered by it; they have shown no good excuse, in fact they admit (it was admitted in argument at the trial) that the *hawser* was wholly insufficient, by reason of which the loss occurred. If the plaintiff was to assume any risk out of the ordinary course of contracts in such cases it would have been so agreed. But no such agreement was made. It cannot be inferred from the fact the plaintiff was a stockholder.

IV. The fourth point is not well taken. It was no part of the duty of the treasurer of a company, residing and keeping his office in San Francisco, to manage the steam-tug of the company plying exclusively in Humboldt Bay, a hundred miles distant. Had he been in charge of the tug, and undertaken the particular business alleged, with the means used, then he should not recover in the premises. But such was not the case. Cole *v.* Goodwin, 19 Wen., 251; 13 Wed., 611; Chitty Cont., Excuses for Non-performance, pp. 629–30.

Mr. Justice HEYDENFELDT delivered the opinion of the Court. Mr. Justice TERRY concurred.

The first point made by the appellant is that " the contract is not for the transportation of persons or property," etc.

The rule of law in the construction of remedial statutes requires great liberality, and whenever the meaning is doubtful, it must be so construed as to extend the remedy. The objection in such cases goes only to the form of the action, and does not affect the merits of the controversy; it therefore does not commend itself so as to demand a rigid interpretation. We think that the towing of a vessel out to sea by a steamer, is the transportation of property, without resorting to any other than the necessary construction arising from the generic and common meaning assigned to the word " transport."

2. The objection that the suit was not brought by the real party in interest is not available. The Insurance Company may have the equitable right to the proceeds, or a part of them, but the legal right to

bring the action remains with the plaintiff, and this constitutes him in the view of the law, as much the real party in interest as if he were entitled to the proceeds. Besides, as in this case, where insurance is effected for only a part of the value, the abandonment cannot transfer the interest of the assured any further than that interest is covered by the policy. Arnould on Insurance, 1159; Potapsco Ins. Co. *v.* Southgate, 5 Pet., 622. The facts of this case, then, establish that the abandonment could have operated but a partial transfer, and the plaintiff was still an actual party in interest. It is also beyond question that a recovery will bar another action for the same cause, and whenever a defendant is thus protected, he has no right to make the objection which is here set up.

This question was well considered in the case of Propeller "Monticello" *v.* Mollison, 17 How., and the reasoning there used is to my mind conclusive.

3. It is immaterial to consider whether the defendant was or was not a common carrier, although I think she was, according to the most striking analogies. It is sufficient, however, for the consideration of this point, that the defendant held herself out to the world for engagement in a business for hire, which required prudence, skill, and the use of adequate means, to perform the contracts which she should undertake. The fact, then, that the particular employment required these elements constitutes a stipulation of their existence, which, by clear construction, enters into the contract and forms part of it.

4. In the fourth point made, there is no force whatever. We have been referred in support of it to the case of Murray *v.* The S. C. R. R. Co., 1 McMullen, 398, decided by the South Carolina Court of Errors. Upon examining that case, we find that the doctrine laid down by the Court cannot be maintained upon principle, reason or authority. Three of the Judges of that Court dissented from the opinion of the majority, and the dissenting opinions are beyond doubt, in my mind, the law of the case.

Judgment affirmed.