THE MONARCH.

(District Court, N. D. Florida. July 15, 1916.)

1. TOWAGE ⟾11(1)—LIABILITY OF TUG—CONSTRUCTION OF CONTRACT.
    A towing contract, which provided that the tug should use every means for the safety and safe delivery of the tow, but should in no way be held responsible for same, left the tug under the duty imposed by law to exercise reasonable care, but without liability, except for negligence.
    [Ed. Note.—For other cases, see Towage, Cent. Dig. §§ 11, 14, 16, 21; Dec. Dig. ⟾11(1).]

2. TOWAGE ⟾11(9)—TUG—LIABILITY FOR LOSS OF TOW.
    Libelant hired a tug from respondent to tow its oil barges; the charter providing that the entire tow was under the orders and supervision of the charterer. The tug was sent from Port Arthur, Tex., with two loaded barges in tow for Frontera, Mexico, by way of Tampico. She had sufficient coal to reach Tampico with favorable weather, but libelant, who knew her coal capacity and consumption, placed an extra supply on the barges. The barges were overloaded, and in heavy weather became water-logged, which made the towing slow. When four days out the tug had only coal enough for 36 hours more, and because of heavy seas could not coal from the barges, and to save the tug and crew she abandoned the tow and proceeded to Galveston, which she reached with 4 tons of coal left in her bunkers. She reported for orders, but, receiving none, did not go in search of the barges. Held that, under the circumstances, she was

⟾For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

not liable for the loss of the barges, but that libelant, in sending her out as it did with the overloaded barges, assumed the risk of adverse weather conditions.

[Ed. Note.—For other cases, see Towage, Cent. Dig. § 22; Dec. Dig. ⊂⊃11(9).]

In Admiralty. Suit by Eugene J. F. Coleman, assignee of the Clooney Construction & Towing Company, against the I. H. Aiken ·Towboat & Barge Company, owner of the steam tug Monarch. Decree for respondent.

Harry T. Smith & Caffey, of Mobile, Ala., for libelant.

Blount & Blount & Carter and W. A. Blount, Jr., all of Pensacola, Fla., for respondent.

SHEPPARD, District Judge. This case involves the liability of a tug under a towage contract which limited the liability of the tug to "use every means for the safety and safe delivery" of the tows, by which the Clooney Construction Company was transporting oil by barge from Port Arthur, Tex., to Frontera, Mexico. It was understood "that the entire tow is under the orders and supervision of the Clooney Construction Company," but that the steam tug Monarch, hired from the I. H. Aiken Towboat & Barge Company, was to tow the barges between the points mentioned.

Two previous trips had been successfully accomplished, but on the third voyage the tug, on the fourth day out, owing to high winds and heavy seas, was unable to replenish her bunkers with coal from the barges, placed thereon by the charterers, and the master, after conference with crew, decided that with the progress the tow was making against adverse conditions it was impossible to reach Frontera, or any other point where fuel could be obtained, or where coaling from the barges would be possible, abandoned the tow at sea, and returned to Galveston, where charterers were notified, with request for orders, but none were given.

The record discloses the facts in the case to be: That about the 22d day of May, 1912, the steam tug Monarch (hereafter called the tug) left Pensacola, Fla., for Port Arthur, Tex., via Calcasieu Pass, La., with 45 tons in her bunkers and approximately 20 tons on deck. At an intermediate point the tug took in tow two unloaded barges of the Clooney Construction Company (hereafter referred to as the charterers). Arriving at Port Arthur, the tug exchanged these barges for two which were loaded with oil destined for Frontera, Mexico. This was the third voyage contemplated under the existing contract with the charterers. The duty of the tug under the contract is expressed in the following paragraph:

"It is understood that the entire tow is under the orders and supervision of the Clooney Construction Company, and in performing this work the I. H. Aiken Towboat Company shall use every means for the safety and safe delivery of each tow specified, but are in no way to be held responsible for same."

Prior to entering into the contract the tug owners advised the charterers of the speed, capacity, and coal consumption of the tug. With the approval of the charterers a mariner was employed for this voy-

age by the tug owners, who was acceptable to both parties as competent.

After clearing from Port Arthur with the tow, the master set the course of the tug for Frontera, Mexico, via Tampico. According to the evidence, to have made Tampico would have required about six days proceeding at normal speed with the tow. With the weather fair and everything favorable the tug had a sufficient supply of coal for the voyage to Tampico. She did not have enough coal on board for a voyage first to Frontera without a stop for recoaling. The charterers, knowing the capacity of the tug, accepted her and permitted her to go to sea with the loaded barges. With the co-operation of the respondent the charterers sought to overcome the lack of fuel capacity of the tug by placing an ample supply on the stern of each of the barges making up the tow.

On the voyage from Pensacola to Port Arthur the tug consumed a portion of the supply of 45 tons stored in her bunkers, which was in turn replenished from the 20 tons supply carried on deck. Arriving at Port Arthur, the tug took on deck from one of the barges about 20 tons of coal to replace that which had been taken from the deck supply to replenish her bunkers. With this and that remaining on the barges the tug put to sea.

The evidence shows that the barges were sent to sea heavy loaded. After the tow was at sea four days, a strong head wind and high sea arose on the 27th, which continued throughout the 28th, when about 1 p. m. the tow was set adrift. Of her original supply the tug had left coal for about 36 hours' steaming. Because of the insuperable difficulties of coaling from the barges at that time, the tug made for Galveston, arriving there about noon of the following day. Upon reaching Galveston it was ascertained the tug had left in her bunkers about 4 tons of coal. When the barges were abandoned the tug and tow had traversed about 250 miles, probably half the distance from Port Arthur to Tampico. At this time the tug was about 230 miles from Galveston and 136 miles from Aransas Pass, Tex. From Galveston the master of the tug notified the charterers of the loss of the tow and that she awaited orders. No orders were received, and the tug did not return to sea, and made no effort to recover the barges.

[1] The libelant contends that the owners of the tug are liable for the value of the barges, and bases his claim on substantially the following enumerated derelictions, viz.: (1) In leaving Port Arthur with a scant supply of coal for the voyage; (2) in failing to lay a course so that the tug, in case of necessity, could make a port of safety; (3) in not proceeding directly toward Frontera until the storm abated, coaling at sea when conditions permitted; (4) in not laying her course via Tampico, so that she might coal there; (5) in not making for Aransas Pass for a safe harbor and recoaling; and (6) in not making for Aransas Pass light, after the barges were released, there to recoal and return to the tow at sea.

On the other hand, the respondent contends: That the tug left Port Arthur fully coaled. That the charterers were advised of her coal capacity, speed, and coal consumption. That the charterers provided

means for coaling at sea in case of necessity, and in so doing, and accepting said tug with knowledge of her capacity, it assumed the risk of the tug's ability to coal at sea. That the barges were overloaded, and therefore more onerous and more liable to dangers of the sea, and what might have been anticipated actually occurred; i. e., the barges were water-logged at sea, thus materially diminishing the speed of the tow, requiring the normal consumption of coal without making the usual mileage. As a consequence of the water-logged condition it was impossible at that time and distance to carry the tow to a port of safety, in view of the shortage of fuel and the impossibility of obtaining any part of that on the barges. That to save the tug and the crew the master was justified in abandoning the tow and making for a port where it was certain that a new supply of coal could be had. That in the circumstances the tug was under no duty to return to sea in search of the barges.

From the course of the tug and tow as disclosed by the evidence it is not probable that they were making for Frontera direct. The weight of the testimony shows the tow was proceeding via Tampico, and I am constrained to regard the case as though the voyage was to be made that way. It may be granted that it was a hazardous thing to attempt the voyage with just sufficient coal on board to consummate the trip in fair weather with everything going well; but the charterers' engagement of the tug for the service and its voluntary efforts to enlarge the coal capacity of the tug contemplated but one thing, namely, that when the tug should need a new supply of coal that it should be taken from the barges at sea as the occasion required.

Allowing the barges to go to sea in this contingency, the charterers must be held to have assumed the risk of the tug's ability to coal at sea. While there are some inconsistencies urged in libelant's argument, it may be summed up to one proposition; i. e., whether or not the master of the tug was in the circumstances justified in willfully setting adrift the tow, and, if so, then was he negligent in not attempting to recover it at sea?

A clear preponderance of the evidence shows that the barges were overloaded, and this overloading has a material bearing upon the question as to the diminished speed of the tow, and in so far as it was a contributing cause to the water-logging of the barges, if in fact they were water-logged.

It must be admitted that the master of the tug knew at the time of departure that the barges were overloaded, and he knew as well as the charterers that in consequence the progress of the tow would be slow. He was aware of the difficulties of coaling from the barges at sea, as well. The charter provided, non constat that the "entire tow" was "under the orders and supervision of the Clooney Construction Company" and that the tug owners were "in no way to be held responsible for same," which of itself shows that the master of the tug owed no duty to the tow until it passed into his control and was subject to his direction, notwithstanding the contract provided that the tug "shall use every means for the safety and safe delivery of each tow."

The maritime law, in the absence of contract, requires that a master exercise the reasonable care, skill, and diligence, in everything relating to the work to be done, which a prudent and cautious navigator would employ in a similar service. Libelant contends that in the instant case the obligation of the tug was broadened and extended, and that the contract required the exercise of a higher degree of skill and diligence than that imposed by law in the absence of contract. I do not accede to this view, for, taking the contract as a whole, its limitation of liability for any cause, as well as the obligation of the tug to "use every means," resolves itself in the last analysis to a mere reiteration of the maritime law. This would throw no responsibility on the tug for injuries to the tow, save those due to its own negligence. The tug could not contract away its liability for negligence. Consequently, when the contract required the use of "every means," it necessarily must be held to describe that which is exacted by the maritime law, the exercise of every *reasonable* means available. To have required the tug to stay in the storm with the tow, with the chances that her fuel would run out, placing her in a helpless condition, imperiling not only the safety of the tug, but that of the crew, would be beyond the pale of reason.

It appears that the main fault with the undertaking and the thing which defeated its accomplishment was overloading the barges. The charterers maintain that they were seaworthy, even though heavy loaded. The respondent insists in the first instance that they were not seagoing barges, and that to load them as they were loaded invited disaster, by making them peculiarly liable to water-logging and thus to be rendered unseaworthy. If they had been seagoing barges and had been properly loaded, there can be little doubt that they would have made faster speed and accomplished the voyage safely. It must be admitted that the overloading contributed in no small degree to the water-logging. Manifestly the tug cannot be held responsible for a condition due in the first instance to the carelessness of the charterers at a time when the tug had no control of the tow.

The master of the tug testified that at the time the barge masters came aboard each told him the barges were water-logged. The barge master who testified denied this statement, and swore that his barge was not water-logged. Under the circumstances, it is highly probable that the admissions made at the time are entitled to more credence. Even if the barge master's declarations were not true as to the condition of the barges, the situation confronting the master of the tug was such as to warrant his accepting it in determining in the circumstances the proper course to pursue.

It is the inevitable conclusion that the shortage of fuel caused the abandonment of the tow; it is equally certain that it was the imminent condition of the barges which prevented any attempt to make a port of safety with them, or either of them. The barge masters were the agents of the charterers, and their statements in extremis would bind their principal.

The master of the tug was under no duty in the circumstances to seek corroboration of their representations as to the condition of the

barges. There was present no reason to doubt such statements, in view of the voyage thus far made; and in the absence of anything which would charge the master of the tug with knowledge of any incompetence on the part of the barge masters, he was under no duty to go further in his investigation.

[2] Libelant's further contention that the tug should have made to the port of Aransas Pass with the tow is untenable in the circumstances, for there was not at the time sufficient coal on board the tug to warrant the attempt. It may be that the tug could have gone to Aransas Pass light, recoaled, and returned for the barges; but it is only in the realm of speculation that she would have recovered the tow. None of the crew of the Monarch, and no member of the crew of either barge, is it shown, had any definite knowledge of the harbor facilities at Aransas Pass. Admitting that the tug and tow, or the tug alone, could have refuged there, the master of the tug chose the nearest port he knew where it was certain that the needed coal supply could be had. For this lack of knowledge of the harbor facilities the master of the tug may not be charged with incompetence. The duty devolving upon the tug was reasonable caution and diligence. The burden is upon him who charges it to show neglience. Scrutiny into the conduct of the master after the event of disaster is not the test of negligence. The test is whether the course of the master was in accord with that which other prudent, skillful, and experienced navigators would have taken in the exigency as it appeared to the master at the time he was called upon to act, and not as they may appear to the court after a more careful scrutiny than the master could have given them. In the absence of any testimony as to what an experienced and skillful master would have done under the circumstances, I cannot conclude that the master of the tug should have acted otherwise. For aught that appears he acted with an honest intent to do his duty, and exercised the reasonable discretion of an experienced navigator, where the circumstances presented to him a choice of action. In the absence of evidence establishing any better criterion, I am of the opinion that the master's decision is conclusive, and that the tug should be exonerated.

A decree dismissing the libel should therefore be entered.