## BISSO, RECEIVER, *v.* INLAND WATERWAYS CORPORATION.

No. 50. Argued February 28, 1955.—Decided May 16, 1955.

*Eberhard P. Deutsch* argued the cause for petitioner. With him on the brief was *René H. Himel, Jr.*

*Ralph S. Spritzer* argued the cause for respondent. With him on the brief were *Solicitor General Sobeloff, Assistant Attorney General Burger* and *Samuel D. Slade.*

*Selim B. Lemle* filed a brief for the American Barge Line, Inc. et al., as *amici curiae,* urging affirmance.

MR. JUSTICE BLACK delivered the opinion of the Court.

The question presented is whether a towboat may validly contract against all liability for its own negligent towage. Since there is no controlling statute the question must be decided as a part of the judicially created admiralty law. Federal courts have disagreed as to whether

there is or should be a judicial rule invalidating such contracts. Calling attention to this uncertainty, the District Court, sitting in admiralty, sustained a contractual provision exempting respondent towboat owner from liability for negligence and entered judgment accordingly. 114 F. Supp. 713. The Court of Appeals affirmed. 211 F. 2d 401. We granted certiorari to settle the question. 348 U. S. 811.

The record including the findings of fact shows: Petitioner's oil barge *Bisso* while being towed up the Mississippi River by the respondent's steam towboat *Cairo* collided with a bridge pier and sank. At the time, the barge had no motive power, steering apparatus, officers or crew, its movements being completely controlled by the *Cairo*. Negligent towage by those operating the *Cairo* caused the collision. Consequently, respondent, owner of the *Cairo*, would have been required to pay petitioner damages unless relieved of liability by certain clauses in the towage contract. One provides that the towing movement should be at the "sole risk" of the barge, and a second provides that masters, crews and employees of the towboat *Cairo* should "in the performance of said service, become and be the servants" of the barge *Bisso*. The Court of Appeals construed both these clauses as relieving respondent from liability for its negligence and held both valid.

A release-from-liability clause in a towage contract was first considered by this Court in 1871 in *The Steamer Syracuse,* 12 Wall. 167. There negligent towage by the *Syracuse* damaged a canalboat being towed. To escape liability owners of the towboat relied on a contractual agreement that "the canal-boat was being towed at her own risk." Notwithstanding the agreement, this Court held that the towboat "must be visited with the consequences" of its negligence.[1] For many years *The Syra-*

---

[1] "It is unnecessary to consider the evidence relating to the alleged contract of towage, because, if it be true, as the appellant says, that,

*cuse* seems to have been generally accepted as either (1) construing a contract to "tow at own risk" as not including an exemption from negligence, or (2) holding invalid as against public policy a contract which exempts a tower from his negligence.[2]

In 1909 *The Syracuse* was repudiated by the Second Circuit in *The Oceanica,* 170 F. 893. That court construed a contract requiring a towed vessel to "assume all risks" as exempting the tower from responsibility for its negligence; it also held, over strong dissent, that the contract was not invalid as against public policy. And on rehearing the court conceded that "the decision of the majority of the court as to the right of a tug to contract against her own negligence is a departure from previous decisions." The court went on to express hope that the question would "be set at rest in this case by the Supreme Court." Certiorari was denied,[3] however, and courts in the Second Circuit continued to follow the newly announced *Oceanica* doctrine.[4] But other circuits continued

by special agreement, the canal-boat was being towed at her own risk, nevertheless, the steamer is liable, if, through the negligence of those in charge of her, the canal-boat has suffered loss. Although the policy of the law has not imposed on the towing boat the obligation resting on a common carrier, it does require on the part of the persons engaged in her management, the exercise of reasonable care, caution, and maritime skill, and if these are neglected, and disaster occurs, the towing boat must be visited with the consequences. It is admitted in the argument, and proved by the evidence, that the canal-boat was not to blame, and the inquiry, therefore, is, was the steamer equally without fault?" *The Steamer Syracuse,* 12 Wall. 167, 171.

[2] See, *e. g., Alaska Commercial Co.* v. *Williams,* 128 F. 362, 366 (1904); *The Edmund L. Levy,* 128 F. 683, 684 (1904); *The M. J. Cummings,* 18 F. 178 (1883); *The Jonty Jenks,* 54 F. 1021, 1023 (1893); *The Oceanica,* 144 F. 301 (D. C. W. D. N. Y. 1906). See also cases collected in 54 A. L. R. 104, 243–257.

[3] 215 U. S. 599.

[4] See, *e. g., Ten Eyck* v. *Director General of Railroads,* 267 F. 974 (1920); *The Mercer,* 14 F. 2d 488 (1926).

to refuse to allow towboats by contract to escape liability for their negligent towage.[5]

It was in that state of intercircuit conflict that this Court again, in 1928, considered the effect of a contract claimed to exempt a towboat from its negligence. *The Wash Gray*, 277 U. S. 66.[6] The contract involved provided that the towboat should not be "responsible in any way for loss or damage" to the *Wash Gray*, the vessel being towed. This Court was urged to follow *The Oceanica*. But counsel for the *Wash Gray*, relying on *The Syracuse*, insisted that recovery for "actionable negligence is not barred by release in contract for towage." [7] Without mention of *The Oceanica* this Court said: "We do not think that the towing contract has the effect claimed for it by the companies. It did not release the [towboat] . . . from any loss or damage to the 'Wash Gray' due to the negligence of the master or crew of the towing vessel . . . . The rule laid down by this Court in *The Steamer Syracuse* . . . covers the point." 277 U. S., at 73. The contracts in *The Syracuse* and *The Wash Gray* were worded quite differently, and there is little indication that the "rule" the Court had in mind was one of mere contractual interpretation. Rather a public policy objection to such contracts was indicated by the Court's quoting from that part of *The Syracuse*

---

[5] See *Mylroie* v. *British Columbia Mills Tug & Barge Co.*, 268 F. 449 (C. A. 9th Cir.); *Great Lakes Towing Co.* v. *American S. S. Co.*, 165 F. 2d 368 (C. A. 6th Cir.); *The Somers N. Smith*, 120 F. 569 (D. C. Me.); *The Monarch*, 235 F. 795, 799 (D. C. N. D. Fla.); *The Sea Lion*, 12 F. 2d 124 (D. C. N. D. Calif.); *The Vim*, 40 F. 2d 638 (D. C. R. I.). See also *Walter G. Hougland, Inc.* v. *Muscovalley*, 184 F. 2d 530 (C. A. 6th Cir.). Compare *The Pacific Maru*, 8 F. 2d 166 (D. C. S. D. Ga.).

[6] Officially reported as *Compañia de Navegacion Interior, S. A.* v. *Fireman's Fund Ins. Co.*, 277 U. S. 66.

[7] Supplemental Brief for Petitioner, p. 10, *The Wash Gray*, 277 U. S. 66.

opinion which pointed out that despite the contract there the towboat had to bear the consequences of its negligence even though the law had not imposed on it the obligations resting on a common carrier.[8]

It is nevertheless argued that *The Syracuse* and *The Wash Gray* did not announce a rule of public policy against release-from-negligence contracts but decided no more than what the towage contracts in those cases meant. Strong arguments can be made in support of this contention but we think stronger arguments can be made against it. *The Syracuse* was decided in an era of manifest judicial hostility toward release-from-negligence contracts, particularly those made by businesses dealing widely with the public and having potential monopolistic powers.[9] That hostility caused this Court two years later to declare that public policy forbade common carriers to make such contracts.[10] The next year telegraph company contracts were brought under the same ban although the Court stated they were not common carriers.[11] Largely because of this general judicial attitude and the influence of *The Syracuse* no towage release-from-negligence clause appears to have been enforced by any court for 38 years. During that period and later enforcement was refused in two ways—either by giving

---

[8] See note 1, *supra*.

[9] The same attitude was manifested by the rulings of those courts which imposed the strict liability of common carriers on tugs. See *Smith* v. *Pierce*, 1 La. 350 (1830); *Vanderslice* v. *The Superior*, 28 Fed. Cas. 970 (D. C. E. D. Pa. 1850); *White* v. *The Mary Ann*, 6 Cal. 462 (1856); *Ashmore* v. *Penn. Steam Towing & Transp. Co.*, 4 Dutcher 180 (N. J. 1860); *Wooden* v. *Austin*, 51 Barb. 9 (N. Y. 1866). As to liability of steamships generally see *Butler* v. *Pennsylvania*, 10 How. 402, 416.

[10] *Railroad Co.* v. *Lockwood*, 17 Wall. 357. See also *Liverpool & Great Western Steam Co.* v. *Phenix Ins. Co.*, 129 U. S. 397.

[11] *Express Co.* v. *Caldwell*, 21 Wall. 264, 269–270; see also *Brown* v. *Postal Tel. Co.*, 111 N. C. 187, 16 S. E. 179.

such contracts a very narrow construction or by holding them to be against public policy. One court even expressly declared it to be "contrary to public policy to so construe" a contract that a tower could be allowed to go clear of all liability for his own negligence.[12] When the Second Circuit belatedly departed from *The Syracuse* other courts still refused to enforce towers' stipulations against their negligence. And when this Court was urged in *The Wash Gray* to repudiate *The Syracuse* by following *The Oceanica* the answer was an emphatic reiteration and approval of the language and holding of *The Syracuse*. Viewed in light of this history, we think *The Syracuse, The Wash Gray* and intervening lower court cases together strongly point to the existence of a judicial rule, based on public policy, invalidating contracts releasing towers from all liability for their negligence.[13] Because of this judicial history and cogent reasons in support of a rule outlawing such contracts we now, despite past uncertainty and difference among the circuits, accept this as the controlling rule.

This rule is merely a particular application to the towage business of a general rule long used by courts and legislatures to prevent enforcement of release-from-negligence contracts in many relationships such as bailors and

---

[12] "Such a bargain doubtless means something; but it is contrary to public policy to so construe a contract of that nature that the tower is allowed to go clear of all liability when it is shown that he has relaxed his faithfulness and duty in performing the service." *Ulrich* v. *The Sunbeam,* 24 Fed. Cas. 515 (1878). See Note, 175 A. L. R. 8, 18.

[13] Writers have differed as to the validity of such towage clauses. Of two leading authors on admiralty one regards the clauses as valid, 1 Benedict, Admiralty (6th ed. 1940), § 100, and the other regards them as invalid, saying "Thus obliquely it seems to be settled that the contract exempting the tug from its negligence is not valid." Robinson, Admiralty (1939), 672.

bailees,[14] employers and employees,[15] public service companies and their customers.[16] The two main reasons for the creation and application of the rule have been (1) to discourage negligence by making wrongdoers pay damages, and (2) to protect those in need of goods or services from being overreached by others who have power to drive hard bargains.[17] These two reasons are no less applicable today than when *The Syracuse* and *The Wash Gray* were decided. And both reasons apply with equal force whether tugs operate as common carriers or contract carriers.[18] The dangers of modern machines make it all the more necessary that negligence be discouraged. And increased maritime traffic of today makes it not less but more important that vessels in American ports be able to obtain towage free of monopolistic compulsions.

The practical result of leaving towers wholly free to contract against all liability for their negligence is strikingly illustrated in an English case. The Port of London

[14] See cases collected in 175 A. L. R. 110–141; Willis, *The Right of Bailees to Contract Against Liability for Negligence*, 20 Harv. L. Rev. 297.

[15] *Duncan* v. *Thompson*, 315 U. S. 1; *Boyd* v. *Grand Trunk Western R. Co.*, 338 U. S. 263, 266; see Beers, *Contracts Exempting Employers from Liability for Negligence*, 7 Yale L. J. 352.

[16] See cases collected in 175 A. L. R. 38–74.

[17] *Id.*, at 8–157. On the question of towage contracts exempting towers from negligence see note 2, *supra*, and cases collected in 54 A. L. R. 104.

[18] Part III of the Interstate Commerce Act regulates tugs as common carriers under some circumstances and as contract carriers under others. 54 Stat. 929–952, 49 U. S. C. §§ 901–923. See *Cornell Steamboat Co.* v. *United States*, 321 U. S. 634. Apart from statutes towboats sometimes operate in such way that they are held to be common carriers. See note 9, *supra*. And it is a long settled policy that common carriers cannot by contract escape all liability for their own negligence. See, *e. g.*, *Liverpool & Great Western Steam Co.* v. *Phenix Ins. Co.*, 129 U. S. 397, 438–443. An examination of the cases, however, discloses the difficulty of determining when a tug is or is not operating as a common carrier.

controlled and operated all tugs in the harbor and by law no ship could enter without the aid of Port Authority tugs. But no shipowner could get a Port tug unless he first signed a contract agreeing to be liable for all damages caused by the negligence of the tug's employees. Under such a contract the court allowed the Port Authority to recover damages from a ship towed for injuries to the Port's tug caused by negligence of the Port's employees running the tug.[19] Such a result would be impossible under the rule we accept as controlling.

It is contended that the towage contract rule we have accepted was rejected by this Court in *Sun Oil Co.* v. *Dalzell Towing Co.*, 287 U. S. 291.[20] We disagree. Unlike *The Syracuse, The Wash Gray* and the instant case, *Sun Oil* did not involve a contract designed to relieve a towboat owner from liability for negligent towage. The contractual clause there involved related only to pilotage. The clause provided that a tug captain who piloted a vessel propelled on its own power should be considered the servant of that vessel and that the tug owners should

---

[19] *The President Van Buren*, 16 Aspinall's Maritime Cases (N. S.) 444. A further illustration of the monopoly potential of the tug business is suggested in *Boston Metals Co.* v. *The Winding Gulf*, decided today, *post*, p. 122. Petitioner in that case insisted before the Court of Appeals that if given an opportunity it could present evidence showing that when it executed the contract containing the proscribed clause with the Foundation Maritime of Canada that company had a virtual monopoly in all eastern Canadian seaports and that the petitioner's boat could not have been moved at all unless it agreed to the conditions forced on it in that contract.

[20] The Second Circuit has taken this position. *North River Barge Line* v. *Chile S. S. Co.*, 213 F. 2d 882, 884 (1954). *The Oceanica* was adhered to, but apparently on slightly different grounds from those originally relied on. Holding a towage agreement for exemption from negligence valid, the court said, "A contrary dictum in The Syracuse . . . was approved in [*The Wash Gray*]. But we think that Sun Oil . . . is to be taken as, in effect, accepting the doctrine of The Oceanica."

not be liable for his negligent pilotage.[21]   *Sun Oil* con-
strued this contract as relieving the tugboat owners from
all liability for negligence of the tug captain while pilot-
ing Sun Oil's vessel and held the contract valid as thus
construed.   But both the Court of Appeals[22] and this
Court recognized that holding the pilotage contract valid
did not conflict with *The Syracuse* or *The Wash Gray*.
Indeed, this Court expressly stated that the *Sun Oil* decree
was "not in conflict with the decisions" in *The Syracuse*
and *The Wash Gray*.   It is of course possible that the
Court found an absence of conflict in the cases because
of a different construction given the different contracts
involved.   We doubt this, but however this may be there
are more basic differences upon which we prefer to rest
this Court's statement that *Sun Oil* did not conflict with
the two prior cases.

There are distinctions between a pilotage and a towage
exemption clause which make it entirely reasonable to
hold one valid and the other invalid.   A pilotage clause
exempts for the negligence of pilots only; a towage clause
exempts from all negligence of all towage employees.
Pilots hold a unique position in the maritime world and
have been regulated extensively both by the States and
Federal Government.[23]   Some state laws make them pub-

---

[21] "When the captain of any tug engaged in the services of towing
a vessel which is making use of her own propelling power goes on
board said vessel, it is understood and agreed that said tugboat cap-
tain becomes the servant of the owners in respect to the giving of
orders to any of the tugs engaged in the towage service and in respect
to the handling of such vessel, and neither the tugs nor their owners
or agents shall be liable for any damage resulting therefrom."   287
U. S., at 292–293.

[22] 55 F. 2d 63.

[23] See, *e. g.*, R. S. §§ 4235–4237, 4442, 4444, 46 U. S. C. §§ 211–215;
40 Stat. 549, 46 U. S. C. § 223; R. S. § 4439, 46 U. S. C. § 228; R. S.
§§ 4449, 4450, as amended, 46 U. S. C. §§ 239, 240; McKinney's
N. Y. Laws, Navigation Law, §§ 41, 64, 87–98, Penal Law, §§ 1501,

94

lic officers, chiefly responsible to the State, not to any private employer. Under law and custom they have an independence wholly incompatible with the general obligations of obedience normally owed by an employee to his employer.[24] Their fees are fixed by law and their charges must not be discriminatory. As a rule no employer, no person, can tell them how to perform their pilotage duties. When the law does not prescribe their duties, pilots are usually free to act on their own best judgment while engaged in piloting a vessel. Because of these differences between pilots and towage employees generally, contracts stipulating against a pilot's negligence cannot be likened to contracts stipulating against towers' negligence. It is one thing to permit a company to exempt itself from liability for the negligence of a licensed pilot navigating another company's vessel on that vessel's own power. That was the *Sun Oil* case. It is quite a different thing, however, to permit a towing company to exempt itself by contract from all liability for its own employees' negligent towage of a vessel. Thus, holding the pilotage contract valid in the *Sun Oil* case in no way conflicts with the rule against permitting towers by contract wholly to escape liability for their own negligent towing. That rule renders invalid the first provision of the contract in this case that the towing had to be done at the sole risk of the towed vessel.

The second clause in the contract—that the employees of the towboat *Cairo* should be servants of the barge *Bisso*—likewise cannot be enforced. For if valid, the only effect of that clause would be to shift all liability for negligent towage from the towboat to the vessel being towed, precisely what the first clause attempted to do.

---

1913, 1961, Lien Law, § 80; *Kotch* v. *Board of River Port Pilot Comm'rs*, 330 U. S. 552, 557–564; *Cooley* v. *Board of Wardens*, 12 How. 299.

[24] *Ibid.* See also *The China*, 7 Wall. 53; *The Eugene F. Moran*, 212 U. S. 466; *Smith* v. *Pierce*, 1 La. 350, 357–358 (1830).

This is true because employees of a towboat do not become employees of a vessel being towed just because a contract says so, when as here the workers are in truth and in fact solely employees of the towboat.[25] This towboat belonged to respondent. It was manned by workers hired and paid by respondent. They remained at all times subject to respondent's complete control. In contrast, the owners of the barge being towed never had any relationship of any kind or character with those who controlled and operated the towboat. The rule against contractual exemption of a towboat from responsibility for its own negligence cannot be defeated by the simple expedient of providing in a contract that all employees of a towboat shall be employees of the towed vessel when the latter "employment" is purely a fiction.          *Reversed.*

MR. JUSTICE HARLAN took no part in the consideration or decision of this case.

MR. JUSTICE DOUGLAS, concurring.[*]

I join in the opinion of the Court. I do not think we know enough about the economics and organization of this business [1] to change the established rule of *The Steamer*

[25] See *The Adriatic*, 30 T. L. R. 699; compare *The President Van Buren*, 16 Aspinall's Maritime Cases (N. S.) 444.

[*][This opinion applies also to *Boston Metals Co.* v. *The Winding Gulf, post,* p. 122.]

[1] Aspects of the economics of the tugboat industry in New York Harbor are shown in *Harbor Fleet*, 27 Fortune 99 (May, 1943); *Docking Leviathans in the World's Busiest Harbor*, 75 Travel 4 (June, 1940); *Friendly Ushers of New York Harbor*, Christian Science Monitor Magazine Section, July 14, 1937, p. 8; *Tugging in the Big Time,* Saturday Evening Post, Mar. 24, 1945, p. 26; *Admiral Moran's Private Navy*, Collier's, Jan. 15, 1949, p. 9; *Earnings on Tugboats and Barges in New York Harbor*, Jan. 1945, 61 Monthly Labor Review 1192.

For an English historical account see Bowen, *A Hundred Years of Towage* (1933).

*Syracuse*, 12 Wall. 167, 171, and *The Wash Gray*, 277 U. S. 66, 73, that a tug may not contract against her own negligence.

I agree with the Court that *Sun Oil Co.* v. *Dalzell Towing Co.*, 287 U. S. 291, was not a departure from that rule. In that case the vessel which was being assisted by the tugs was under her own power and was manned by her own crew. The negligence was that of a tug captain on board the vessel under tow. The Court enforced the contract, which made his negligence the negligence of the vessel, under the familiar rule that "when one puts his employee at the disposal and under the direction of another for the performance of service for the latter, such employee while so engaged acts directly for and is to be deemed the employee of the latter and not of the former." *Id.*, at 295.

In the *Sun Oil* case, the tug was not a common carrier or a contract carrier. It was merely assisting a vessel under her own power. Here we are dealing with dead tows, where the tug and the tug alone is in control, where the tows are without power and without crews.

In that situation, the tugboats are common carriers [2] when they so hold themselves out (*Stimson Lumber Co.* v. *Kuykendall*, 275 U. S. 207; *Cornell Steamboat Co.* v. *United States*, 321 U. S. 634) or contract carriers.

So far as we know, the tugboats in the present cases are as much common carriers as the tugboats in the *Cornell Steamboat* case and the *Stimson Lumber Co.* case.

Common carriers may not "by any form of agreement secure exemption from liability for loss or damage caused

---

[2] If they are common carriers, they may be subject to pervasive regulation by the Interstate Commerce Commission under Part III of the Interstate Commerce Act, 54 Stat. 898, 929, 49 U. S. C. §§ 901, 905 *et seq.*, as *Cornell Steamboat Co.* v. *United States, supra,* held. If they are contract carriers, certain of their activities may likewise be subject to regulation under that Act. See, for example, 49 U. S. C. §§ 906 (e), 907 (i), 913–917.

by their own negligence." *Sun Oil Co.* v. *Dalzell Towing Co., supra,* at 294. See *Railroad Co.* v. *Lockwood,* 17 Wall. 357; *Liverpool Steam Co.* v. *Phenix Ins. Co.,* 129 U. S. 397. The reasons are as germane to a tugboat that is a contract carrier as they are to a tugboat that is a common carrier. They were well stated by Judge Coxe, dissenting in *The Oceanica,* 170 F. 893, 896:

> "It ought to be against public policy to permit a vessel to contract against her own fault. To allow her to do so begets recklessness, carelessness and neglect. The same reasons for prohibiting such a contract in the case of common carriers apply, though not, perhaps, to the same extent, in the case of a towage contract. In both cases the design is to prevent those who have the absolute control of another's property from extorting an agreement that they may neglect all reasonable precautions to preserve it."

If the tug is only a contract carrier, it is not liable for injury to the tow in the absence of negligence. See *Stevens* v. *The White City,* 285 U. S. 195. But though a contract carrier, the tug may as effectively command the market and have as complete control of the tow and cargo as any common carrier. The reasons stated by Judge Coxe seem, therefore, as germane to the contract carrier as to the common carrier.

It may be that the rule of *The Syracuse* is outmoded and should be changed. It may be that the tugboat industry is less able to carry the risks of those losses than its customers. It may be fairer in the long run to let the tugboat operator free himself from his own negligence and transfer the liability to the shippers who employ his services. But the very statement of the problem raises large questions of policy on which the present records throw no light. We would have to know much more about the economics and organization of the tugboat

industry than we are offered here to fashion a new rule.[3] Accordingly, I would continue to enforce the established rule of *The Syracuse* that has its roots deep in history and experience, until and unless Congress adopts another one.

MR. JUSTICE FRANKFURTER, whom MR. JUSTICE REED and MR. JUSTICE BURTON join, dissenting.

Drawing on its constitutional powers in matters maritime (Art. III, § 2), this Court has probably made as much substantive admiralty law through adjudication as has Congress by legislation. Indeed, not a little of legislation has displaced or modified the Court's decisions. This creative judicial function of making admiralty law remains unimpaired, so that it is within the Court's jurisdiction now to announce, as new doctrine, that tow and tug may not by agreement relieve the tug of liability for damage to the tow caused by the tug's negligence. Of course, the Court should not restrict the area of full bargaining between tow and tug unless an overriding public interest calls for such restriction.

But the Court does not now profess to originate a doctrine of invalidity of such an agreement. Pervading the Court's opinion is the assumption that it is merely making explicit what has been the presupposition and direction, if not the unequivocal pronouncement, of the controlling body of decisions. These decisions, we are told, "strongly point to the existence of a judicial rule, based on public policy, invalidating contracts releasing towers from all liability for their negligence." On this

---

[3] Available statistics of the tugboat industry do not show the breakdown, port by port, between common carriers and contract carriers. Nor do they show how many of the contract carriers are "captive" carriers, servicing one company. Nor do they give a picture of the competitive or monopolistic conditions prevailing in the various ports. We would need an economic brief to enlighten us, if we were to undertake to reformulate the established rule.

assumption, one easily slides to the Court's conclusion. Such an assumption almost implies the conclusion, for a long-established rule, not remotely related to any constitutional question and readily amenable to legislative change, should be adhered to. Especially in the domain of commercial affairs, *stare decisis* has a strong social justification. In conducting their affairs, men naturally assume that courts will not unsettle a settled rule for the conduct of business, certainly not unless experience has made manifest the need for overturning the law.

To assert that a rule has been established by courts necessarily implies authoritative pronouncement of a doctrine, its application to litigation, and its continuing vitality. Such a rule ought to be found in adjudications in this Court or at the very least—in the case of maritime matters—in the weight of authority in lower courts, particularly in the Southern District of New York where admiralty law has to such a large extent developed. The claimed rule cannot avouch the decisions in this Court nor the body of lower court decisions. In their entirety, the decisions reflect the opposite. A critical examination of them yields these conclusions:

(1) In *The Steamer Syracuse,* 12 Wall. 167, this Court did not have before it any claim of exemption from all negligence such as is presented here. *The Steamer Syracuse* therefore could not have decided, and it did not purport to decide, the validity of such an exemption. *The Wash Gray,* 277 U. S. 66, purports to be no more than a decision on a question of construction, in which *The Steamer Syracuse* was cited as precedent for placing a narrow construction on exculpatory clauses.

(2) The Circuits other than the Ninth do not disclose decisions that towboats cannot by contract

escape liability for negligent towage. In the Ninth there is talk, not decision.

(3) In respecting an agreement for exemption in the case of a private carrier, we do not disregard any decision of this Court or any persuasive body of authority in the Courts of Appeals. On the other hand, to recognize the validity of such a provision accords with the decisions and pronouncements of the two Circuits having the most active admiralty business, and with the underlying considerations of policy upon which this Court very recently and unanimously enforced a similar provision for exemption in *Sun Oil Co.* v. *Dalzell Towing Co.,* 287 U. S. 291.

The materials on which these conclusions are based are not esoteric. They are to be assessed, of course, according to time-honored rules for reading cases—that cases hold only what they decide, not what slipshod or ignorant headnote writers state them to decide; that decisions are one thing, gratuitous remarks another. A stew may be a delicious dish. But a stew is not to be made in law by throwing together indiscriminately decision and dicta, cases involving common carriers and private carriers, cases involving monopolistic or otherwise patently unequal bargaining power and cases arising under contracts between parties bargaining at arm's length.

It is essential in examining these cases to differentiate sharply between construction and validity. Since negligence is the ordinary basis for liability, relief from it should be clearly agreed upon between the parties and ambiguity should not leave the extent of such relief in doubt. Accordingly, provisions for exemption are closely scrutinized by courts and doubts either as to the existence of the provision of exemption or its scope are resolved against relief from responsibility. It is fair to say that a number of the cases relied upon for support against the

validity of an exemption are cases in which the existence of such a provision was not established or its meaning was appropriately given limited scope.

These conclusions require documentation.

DECISIONS OF THIS COURT.

1. In *The Steamer Syracuse*, 12 Wall. 167, the crucial issue in the District Court, on appeal in the Circuit Court, and on appeal here, was whether or not on the particular facts of that case the steamer *Syracuse* had been "navigated with ordinary care and skill."

The *Syracuse* had been engaged in towing canalboats through New York harbor. The tug's owners had given the owners of the tow a receipt stating that the service was to be performed "at the risk of her owners." In a libel based on the tug's negligence in permitting the tow to strike an anchored vessel and be sunk, the District Court held that, while the parties were free to vary their responsibilities by contract, the words of the receipt [1] "did not operate to relieve or discharge the steamboat and her owners from the exercise of all reasonable skill." *Langley* v. *The Syracuse,* 14 Fed. Cas. 1115, No. 8,068. This decision was affirmed both by the Circuit Court, *The Syracuse,* 23 Fed. Cas. 593, No. 13,717, and this Court with no suggestion that the controlling issue was other than that on which the District Court had based its decision. Neither in the answer to the libel, nor in the pro-

---

[1] It is significant that the only contractual dispute in the case related to whether or not this receipt formed a part of the contract between the parties. See 12 Wall., at 169. It is to this dispute that the Court directed itself in its opening statement that it was "unnecessary to consider the evidence relating to the alleged contract of towage." Apparently this clause was designed to prevent a tug from being held to a standard stricter than that of ordinary care, which libellant argued should. be imposed if the receipt was not a part of the contract. Cf. note 3, *infra.*

ceedings in the District Court, nor in those in the Circuit Court, including the opinion of Mr. Justice Nelson, sitting as Circuit Justice, nor in the briefs in this Court, nor in the opinion here, was there ever tendered the issue which is tendered in this case—namely, the enforceability of an agreement whereby a private carrier is relieved from liability for negligence. Nor was there any pronouncement on such an issue. Throughout the litigation there is not the faintest suggestion that the receipt raised any issue other than whether the *Syracuse* was or was not "navigated with ordinary care and skill" in the very special circumstances of the particular seamanship. It would seem indeed strange that the brief of E. C. Benedict, probably the leading admiralty lawyer of his day, should not give a hint of reliance on a clause exempting from liability for negligence, but instead bring all its argumentation to bear to prove that the duty to navigate "with ordinary care and skill" was satisfied. He thus framed his only contention regarding the effect of the contract:

> "The boat was towed under a contract on the part of the libellant that he would bear the risks of the navigation, provided, the steamboat which furnished the propulsive power, was navigated with ordinary care and skill.
>
> "This we submit is the fair intent of the contract to tow the boat 'at the risk of her masters and owners.'" Brief for Appellant, p. 3; see 12 Wall., at 170 (summary of argument).

The language of both Mr. Justice Nelson, in the Circuit Court, and Mr. Justice Davis, for this Court, must be read in the light of the issues that were framed in the District Court, the course of evidence in that court, the contentions of the parties and the explicitness of the briefs

in this Court. The claim was not relief from liability for negligence but that the admitted duty of "ordinary care and skill" in navigation had not been satisfied. There is no suggestion, either in this Court's opinion or that of Mr. Justice Nelson on circuit, that a rule of public policy was being announced barring agreements, fairly entered into, relieving private carriers from liability. *The Steamer Syracuse* was decided here in 1871. It was not until 1873 that such agreements were invalidated in the case of common carriers. *Railroad Co.* v. *Lockwood,* 17 Wall. 357. And not until 18 years later was this rule applied to common carriers by water. *Liverpool & Great Western Steam Co.* v. *Phenix Ins. Co.,* 129 U. S. 397. Surely this Court did not impliedly, in a moment of absent-mindedness, declare such a rule in the case of a private carrier and two years later require 25 pages to justify it in the case of common carriers.

Reliance upon any climate of "manifest judicial hostility toward release-from-negligence contracts" existing at this time is singularly misplaced. In this period American legal thought placed entirely too high a value upon liberty of contract. See Pound, Liberty of Contract, 18 Yale L. J. 454. Had there been such an attitude, it could not have been a factor in a case in which both parties agreed that no such contract was involved. Moreover, this hostility, insofar as it was more than a mode of narrowly construing contracts designed to cut down common-law liability, was limited to situations where inequality of bargaining power in relation to essential services called for judicial intervention. Compare *Railroad Co.* v. *Lockwood, supra,* with *Baltimore & Ohio S. R. Co.* v. *Voigt,* 176 U. S. 498; *Santa Fe, P. & P. R. Co.* v. *Grant Bros. Const. Co.,* 228 U. S. 177.

2. The superficial ambiguity of the language of the Court's opinion in *The Steamer Syracuse,* when read

without reference to the issues before it, led some lower courts to speculate as to its meaning. But *Compania de Navigacion La Flecha* v. *Brauer,* 168 U. S. 104, left no ground for such confusion. The *Brauer* case involved a contract for carriage of cattle on the deck of a steamer "at owner's risk, steamer not to be held accountable for accident to, or mortality of, the animals, from whatever cause arising." The contract specified that it was to be interpreted according to English law. A libel against the shipowner was brought for the loss of the cattle which, during a storm at sea, had been unnecessarily driven overboard by the crew. The Court, noting a conflict between American and English decisions regarding the right of a *common* carrier to relieve itself of the consequences of negligence, found it unnecessary to determine which of these rules was applicable, stating:

> "By the laws of both countries, . . . an exception, in the bill of lading, of perils of the sea, or other specified perils, does not . . . exempt him from liability for loss or damage from one of those perils, to which the negligence of himself or his servants has contributed.

> "This rule of construction was fully established in this court before it had occasion to decide the question whether it was within the power of the carrier by express stipulation to exempt himself from all responsibility for the negligence of himself or his servants.

> "In the leading case of *New Jersey Steam Navigation Co.* v. *Merchants' Bank,* 6 How. 344 . . . . [the Court stated] 'But we think it would be going farther than the intent of the parties . . . were we to regard it as stipulating for . . . want of ordinary care . . . .' 'If it is competent at all for the carrier to stipulate . . . it should be required to be done, at least,

in terms that would leave no doubt as to the meaning of the parties.' 6 How. 383, 384. See also . . . *The Syracuse,* 12 Wall. 167." 168 U. S., at 118–120.

This citation of *The Steamer Syracuse* as an example of instances in which a rule of narrow construction of exculpatory clauses had been invoked should have set to rest any misunderstanding concerning the scope of its ruling.

3. *Compañia de Navegacion Interior, S. A.* v. *Fireman's Fund Ins. Co.,* 277 U. S. 66 (*The Wash Gray*), was a consolidation of libels by the owner of the *Wash Gray,* lost while in tow on the Gulf of Mexico, against eleven insurance companies which had underwritten the voyage. One of the defenses of the insurers was that the contract of towage had contained, unknown to them, the following provision which they alleged to have been material to the risk:

> "Freeport Sulphur No. 1 [the tug] will furnish hawser. All other risk and expense to be borne by [the Wash Gray]. It is understood you will keep sufficient men on board to keep up steam and man the tug's pumps. S. S. Freeport No. 1 is not responsible in any way for loss or damage to the Wash Gray."

The District Court had held that the towage clause "does not pretend to release liability for loss or damage growing out of the tower's negligence. Such an intention would be defeated by the very obscurity of its terms." 14 F. 2d 196, 200. The Court of Appeals reversal rested on grounds not here relevant. 19 F. 2d 493.

On writ of certiorari, this Court, reversing the Court of Appeals, dismissed the contention of the insurers in the following terms:

> "We do not think that the towing contract has the effect claimed for it by the companies. It did not release the 'Freeport' from any loss or damage to the

'Wash Gray' due to the negligence of the master or crew of the towing vessel; and for a loss thus caused the companies would be subrogated to the claim of the owner of the 'Wash Gray.'

"The rule laid down by this Court in *The Steamer Syracuse,* 12 Wall. 167, 171, covers the point. . . .

"In view of this state of the law, the towing contract here shown was not a fact material to the risk, a concealment of which from the underwriters would injure them or avoid the policy." 277 U. S., at 73–74.

The wording of the clause differed, to be sure, from that involved in *The Steamer Syracuse.* But the language relied upon by the insurers, in the context of the rest of the clause and the undertaking involved, was no more suggestive of an attempt to avoid liability for negligence than that construed in *The Steamer Syracuse.* It is hardly surprising that the Court applied, at the instance of the party to the contract, the narrower meaning which the parties in *The Steamer Syracuse* had conceded to be proper, and rejected the insurer's attempt to escape liability by attributing the broadest meaning to the clause.

4. Any support for the present decision drawn from the language of *The Steamer Syracuse* and *The Wash Gray* is decisively repelled by the decision in *Sun Oil Co.* v. *Dalzell Towing Co.,* 287 U. S. 291. That case involved the following clause of a contract for assistance of a tanker to its berth at Bergen, New Jersey:

"When the captain of any tug engaged in the services of towing a vessel . . . goes on board said vessel, it is understood and agreed that said tugboat captain becomes the servant of the owners in respect to the giving of orders to any of the tugs engaged in the towage service and in respect to the handling of such vessel, and neither the tugs nor their owners or agents shall be liable for any damage resulting therefrom."

While the captain of one of respondent's tugs was acting as pilot on board the tanker, it went aground and was damaged. In the resulting action against the tug, this Court upheld the validity of the clause, stating:

"The validity of its applicable provision cannot reasonably be doubted. So far as concerns the service to be rendered under the agreement, respondent was not a common carrier or bailee or bound to serve or liable as such. Towage does not involve bailment, and the services covered by the contract were less than towage. . . . There is no foundation in this case for the application of the doctrine that common carriers and others under like duty to serve the public according to their capacity and the terms of their undertaking cannot by any form of agreement secure exemption from liability for loss or damage caused by their own negligence. . . . Respondent had no exclusive privilege or monopoly in respect of the services that petitioner desired to have performed for its tanker. And petitioner was under no compulsion to accept the terms of respondent's pilotage clause. There is nothing to suggest that the parties were not on equal footing or that they did not deal at arm's length. 'There is no rule of public policy which denies effect to their expressed intention, but on the contrary, as the matter lies within the range of permissible agreement, the highest public policy is found in the enforcement of the contract which was actually made.' . . .

"Respondent's responsibility is not to be extended beyond the service that it undertook to perform. It did not furnish pilotage. . . .

"The decree under consideration is not in conflict with the decisions of this court cited by petitioner, *The Steamer Syracuse*, 12 Wall. 167, and *Compañia de Navegacion* v. *Ins. Co.*, 277 U. S. 66. Neither

involved an agreement similar to the provisions of the pilotage clause on which this case turns." 287 U. S., at 294–295.[2]

The opinion distinguishes *The Steamer Syracuse* and *The Wash Gray* not on the ground that there is an essential difference between considerations of policy applicable to towage and pilotage, but expressly and only on the ground that the provisions of the contracts differed, thus viewing the earlier cases as involving no more than matters of construction. Of course there are differences between the situation before the Court in *Sun Oil* and the one now before us. But the analysis which led the Court to its conclusion there is equally applicable here and calls for upholding the validity of this agreement.

DECISIONS IN THE LOWER COURTS.

1. Concededly, the Second Circuit has, ever since the decision in *The Oceanica*, 170 F. 893 (1909),[3] upheld the

---

[2] See also *New York Central R. Co.* v. *The Talisman*, 288 U. S. 239, 242, stating the determinative facts of the *Sun Oil* case to be that "the towage company was not bound to render the service there involved and was not a common carrier or liable as such. That case, and the cases cited which arose under contracts for towage, plainly have no application . . . ."

[3] The Court of Appeals did not there purport to differ with any decision of this Court on the question of validity of exculpatory towage clauses. It said of *The Steamer Syracuse:* "The learned judge must have meant that an agreement by the tow to tow at her own risk should not be construed to cover the tug's negligence." 170 F., at 895. The Court of Appeals felt justified in reaching a different construction of a similar agreement because it had become clear that a tug is not in relation to the tow a common carrier and thus, the court reasoned, no risk could now be referred to by such clauses except the tug's negligence. The discussion of the majority related entirely to construction, not to validity. The later statement on rehearing—"We do appreciate keenly that the decision of the majority of the court as to the right of a tug to contract against

validity of agreements whereby towers avoid liability for their own negligence. Its most recent reiteration of this position is found in *Nielson* v. *United States,* 209 F. 2d 958, today reversed on other grounds, *post,* p. 129. To the Second Circuit there must now be added the Courts of Appeals for the Fourth and Fifth Circuits by virtue of their decisions in this case and in *Boston Metals Co.* v. *The Winding Gulf.*[4] It is not without significance that the Second and Fifth Circuits are first and second in volume of admiralty litigation.

2. In a series of three cases, the Sixth Circuit has assiduously avoided the issue of validity of exculpatory clauses, resting instead upon construction of the clause in issue as not reaching the negligence involved. *Great Lakes Towing Co.* v. *Bethlehem Transp. Corp.,* 65 F. 2d 543;[5]

---

her own negligence is a departure from previous decisions. The question should, and we hope will, be set at rest in this case by the Supreme Court," 170 F., at 900—must either inaccurately express the meaning of the court or refer to the fact that at that time the cautious constructional approach of the lower federal courts had produced no affirmance of the validity of such clauses and one decision which, upon an analogy since discredited, had declared them invalid. See n. 11, *infra.*

[4] 209 F. 2d 410, rev'd, *post,* p. 122. In the course of its opinion, the Court of Appeals stated:

"We are not called upon to decide whether the owner of a tug or the tug itself, which is operating under a contract containing the standard towing conditions, may ever escape liability to a third party for injuries caused by its negligence." 209 F. 2d, at 414.

In context, however, it is clear that this merely amounts to a reservation of the question whether the third party's right to sue the tug was affected by the pilotage clause. In permitting the third party to recover directly from the tow owner by virtue of the clause, the Fourth Circuit necessarily affirmed the right of the tug to shift the burden of liability to the tow.

[5] The clause involved stated:

"When a vessel is towed or pushed stern first by one tug, the service will be under the control and direction of the master of the vessel so

*Great Lakes Towing Co.* v. *American S. S. Co.,* 165 F. 2d 368; [6] *Walter G. Hougland, Inc.* v. *Muscovalley,* 184 F. 2d 530.[7]

3. The Ninth Circuit is the only Circuit which has indicated—but not decided—that it might differ with the Second, Fourth and Fifth Circuit Courts of Appeals were it forced to pass squarely on the issue of validity. The statement in the syllabus to the first of the relevant cases in the Ninth Circuit, *Alaska Commercial Co.* v. *Williams,* 128 F. 362, is inaccurate. While it says that a tug "cannot relieve itself by contract from liability for the failure to exercise reasonable care and skill," the

---

assisted, and the tug will not be liable for any damages that may be sustained or caused . . . ."

The tug in this case had been engaged in pushing a steamer stern first away from its pier when the bow of the steamer struck the dock. The Court of Appeals held the quoted clause inapplicable because in fact the tug had not been operating under the control and direction of the master of the steamer. No question of the validity of an exculpatory clause was involved.

[6] A clause substantially similar to that involved in the earlier *Great Lakes* case, *supra,* n. 5, was likewise construed to be inapplicable on the ground that the tug had been operating independently of any direction from the tow at the time of the accident. In the course of the opinion the court stated:

"Were we therefore compelled to decide the case upon the validity of paragraph 17, it might seem to us that decision must be controlled by the doctrine of The Syracuse, whatever might be our own views of the principle or its applicability to the present case. A narrower ground for decision, however, appears." 165 F. 2d, at 371.

[7] This case involved, apparently, towage under a clause similar to that considered in *The Steamer Syracuse,* stating that the service was to be performed "at the owner's risk." It was contended that this clause relieved the tug from liability for loss of one of the towed vessels which sank in the wake of a larger vessel. The court merely stated: "This contention cannot be sustained under the authorities," 184 F. 2d, at 531, citing *The Steamer Syracuse* and *The Wash Gray* without indicating that they involved more than construction of similar clauses.

court concluded that the lower court had properly
excluded an amendment to the pleadings and testimony
which, it was alleged, was designed to show the existence
of an exculpatory clause. It then merely added:

> "But we are of the opinion that if the plaintiff in
> error had proved the contract to be as in the proposed
> amendment it was alleged to be, it would not have
> afforded it exemption from liability in the present
> case," citing *The Steamer Syracuse.* 128 F., at 366.

*Mylroie* v. *British Columbia Tug Co.,* 268 F. 449,
involved a contract of towage which stated:

> "That the Tug will render to the said Barge
> 'Bangor' reasonable assistance from time to time in
> any emergency which might arise. . . . The Tug
> Company is not to be held liable for any damage
> which might happen to the said barge 'Bangor' or
> its cargo while in tow or at anchor."

The barge had been lost after a sudden change of course
by the tug, made without warning to the barge, caused
the towline to snap. The Court of Appeals was ready
to hold, and appeared to view the *Alaska Commercial*
case as holding, that the tower could not, for reasons of
public policy, avoid liability for negligence. Such a hold-
ing also was attributed to *The Steamer Syracuse.* But, in
a rather confused opinion, the court appears to adopt the
view that the exculpatory clause presupposed the tug's
seaworthiness which in fact was negatived by the absence
of a sufficient crew. Thus the clause was inapplicable.
268 F., at 453. The decision was affirmed in this Court
on the ground that, as a matter of construction and in
accordance with English decisions, the clause meant only
that the tug should not be liable if it had rendered rea-
sonable assistance to the barge. Holding that the tug
had not done so, the Court stated: "This makes it unnec-
essary for us to consider the contention on behalf of the

barge that the exemption clause is void." *British Columbia Mills Tug & Barge Co.* v. *Mylroie,* 259 U. S. 1, 12.

Subsequent developments have not made the Ninth Circuit's position any clearer. In *Sacramento Navigation Co.* v. *Salz,* 3 F. 2d 759, reversed here on other grounds, 273 U. S. 326, that Circuit considered a contract between the owner of a barge and a shipper of merchandise which excused the former from liability for "dangers of fire and navigation." The tug, also owned by the bargeowner, negligently caused loss of the barge and its cargo. The court dismissed the contention that the bargeowner might avoid liability under the quoted provision of the contract expressly as a matter of construction, and, in so doing, indicated that *The Steamer Syracuse, The Oceanica,* and *Mylroie* merely reflected differing constructions of exculpatory clauses.[8] This opinion thus chose to ignore the dicta of *Mylroie.* But subsequent dicta in *Hall-Scott Motor Car Co.* v. *Universal Ins. Co.,* 122 F. 2d 531, indicate that, at least as of 1941, the Ninth Circuit felt that

---

[8] ". . . The exceptions therein expressed extend only to dangers of fire and navigation . . . and they apply only to the barge, and not to the tug . . . . No tug was referred to in connection with the contract of transportation. The exemption clause, therefore, does not excuse negligent towage. The Steamer Syracuse, 12 Wall. 167 . . . Alaska Commercial Co. v. Williams . . . Mylroie v. British Columbia Mills Tug & Barge Co. . . .

"The appellant cites The Oceanica . . . [there the Second Circuit], while accepting the rule that a contract will not be construed to cover the carrier's negligence, unless the intention to do so is expressly stated, held, one judge dissenting, that a tug, being only liable for negligence, if the tow agrees to assume all risks, no risks can be meant, except . . . the consequences of her own negligence. . . . We think that it is a departure from the principles announced in the decisions of the Supreme Court which we have cited. It may be said, by way of distinguishing . . . The Oceanica . . . that the court found in the terms thereof an intention of the contracting parties to absolve the tug from the consequences of its own negligence, whereas, in the case at bar, the contract is wholly between a shipper of cargo and the owner of the barge . . . ." 3 F. 2d, at 761.

precedent in this Court and that Circuit's own decisions had established the invalidity of towage release-from-negligence clauses. In that case, the court reviewed the towage cases in considering analogies to the case before it, one in which a pleasure cruiser being repaired in dry dock was lost through fire and the principal defense was based on a clause in the repair contract stating that the repairer "will not be held responsible for any damage to cruiser 'Pacifica' . . . while the engine installation is being made." The court stated:

> "This court has held that a contract relieving a towing vessel from the results of its negligence is void and has based its decisions upon the decision of the Supreme Court in 1870, in the case of The Steamer Syracuse . . . ," citing *Alaska Commercial* and *Mylroie*. 122 F. 2d, at 535.

After reviewing contra decisions in other circuits:

> "The Supreme Court has unquestionably settled this difference in Compania de Navegacion v. Phoenix [*sic*] Ins. Co., 277 U. S. 66 . . . .
>
> "If these decisions of the Supreme Court and of this court are applicable to a maritime contract to repair a ship it is clear that such a contract to exculpate the contractor for his negligence is invalid." 122 F. 2d, at 535–536.

The court decided, however, that the principles of the *Sun Oil* case were instead to be applied, holding the exculpatory clause valid.

4. It is safe to say that, aside from temporary intra-circuit conflicts within the Second Circuit,[9] never since

---

[9] Compare *Petterson Lighterage & Towing Corp.* v. *The J. Raymond Russell*, 87 F. Supp. 467 (viewing *The Oceanica* as having been overruled by *The Wash Gray*), with *The Primrose*, 3 F. Supp. 267, and *The John J. Feeney*, 3 F. Supp. 270 (viewing exculpatory clauses as valid). The Court of Appeals has, however, consistently held to the

114

ordinary towage has been recognized as not amounting to common carriage[10] has there been a decision in any district court holding invalid clauses which were clearly designed to relieve a tug from liability in the course of its service as a private carrier. Every decision is either limited to a construction of the clause or, if expressions concerning validity appear, they are the merest dicta.[11]

views enunciated in *The Oceanica* and has resolved all such conflicts in favor of the validity of exculpatory towage clauses. That decision was a departure from its earlier narrow construction of exculpatory towage clauses, see *The Edmund L. Levy*, 128 F. 683; *The Syracuse*, 23 Fed. Cas. 593, No. 13,717; aff'd 12 Wall. 167, but not from any decision turning upon validity.

[10] Of course there may be instances where, because of the mode and circumstances of operation, or for purposes of regulatory statutes, towage may be held to involve common carriage. See *Cornell Steamboat Co.* v. *United States*, 321 U. S. 634.

[11] Among the cases cited for the proposition that such clauses are invalid, one, *The Rescue*, 24 F. 190 (D. C. W. D. Pa.), may so hold, but if so on the theory that towage is equivalent to common carriage, a view not now tenable. Two others, *The Monarch*, 235 F. 795, 799 (D. C. N. D. Fla.), and *The Sea Lion*, 12 F. 2d 124, 126 (D. C. N. D. Calif.), contain dicta to the effect that such clauses are invalid. In both cases, however, it was held that the tug was not negligent and the libels were dismissed. Contrary dicta are found in four other cases. *The Pacific Maru*, 8 F. 2d 166, 170–173 (D. C. S. D. Ga.); *Compania de Navegacion, Interior, S. A.* v. *Fireman's Fund Ins. Co.*, 14 F. 2d 196, 200, aff'd 277 U. S. 66; *Mengel Co.* v. *Inland Waterways Corp.*, 34 F. Supp. 685, 690–692; *Compania de Navegacion Cristobal, S. A.*, v. *The Lisa R.*, 116 F. Supp. 560, 561 (all D. C. E. D. La.). All other cases do not expressly go further than to determine that the clause involved did not, as a matter of construction, operate to relieve the tug from liability for the particular negligence involved. These include *The Somers N. Smith*, 120 F. 569 (D. C. Me.); *The Vim*, 40 F. 2d 638 (D. C. R. I.); *The M. J. Cummings*, 18 F. 178 (D. C. N. D. N. Y.); *The Jonty Jenks*, 54 F. 1021 (D. C. N. D. N. Y.); *The Oceanica*, 144 F. 301 (D. C. W. D. N. Y.), rev'd 170 F. 893; *Ulrich* v. *The Sunbeam*, 24 Fed. Cas. 515, No. 14,329 (D. C. N. J.); *Vanderslice* v. *The Superior*, 28 Fed. Cas. 970, No. 16,843 (D. C. E. D. Pa.); *The Skagway*, 1925 Am. Mar. Cas. 1133 (D. C. W. D. Wash.).

INTERPRETATION AND VALIDITY OF THE EXCULPATORY TOW-
AGE CLAUSE.

We are not presented with a longstanding admiralty rule based on public policy invalidating contracts releasing towers from all liability for their negligence. In fact, we are presented with no rule other than that of the Second Circuit and those following it. Private parties have been free for over a century and a half to contract with reference to the rights and liabilities incident to towage. We cannot assume that they have been misled into a contrary belief. Critical analysis of the authorities, both in this country and in England,[12] would not indicate that this freedom had been circumscribed by judicial decision.[13]

---

[12] English law recognizes the validity of tug-tow contracts releasing the tug from liability for its own negligence. *E. g., The Albion,* [1953] 2 All Eng. 679 (C. A.); *The Ramsden,* [1943] P. D. 46; *The Tasmania,* 13 P. D. 110; *The United Service,* 9 P. D. 3 (C. A.); *The President Van Buren,* 16 Aspinall's Rep. (N. S.) 444; see Marsden, Collisions at Sea (10th ed. 1953), p. 216.

Just as has been true of decisions in this country, however, specific language directed at liability for negligence must be used. Thus, where the contract merely stated "all transporting to be at owners' risk," the tower was held liable. The phrase was interpreted merely to mean that if the tug exercised reasonable care and skill the tow would incur the risks incidental to navigation. *The Forfarshire,* [1908] P. D. 339; see also, *The West Cock,* [1911] P. D. 208 (C. A.). The parallel to *The Steamer Syracuse* and *The Wash Gray* requires no elaboration.

[13] 1 Benedict on Admiralty (5th ed. 1925), p. 167, asserts that a "towage contractor . . . may by contract limit or disclaim liability for negligence." Griffin, American Law of Collision (1949), pp. 462–466, after detailed examination of the cases, concludes that the apparent conflict is over construction rather than validity. Robinson on Admiralty (1939), pp. 670–673, suggests that *The Wash Gray* seems "obliquely" to indicate a contrary rule, but juxtaposes the *Sun Oil* case without resolution of its inconsistency with such a view of *The Wash Gray.*

The leading encyclopedias of American case law note an apparent

If deference to Congress as the arbiter of public policy is called for, see *Wilburn Boat Co.* v. *Fireman's Fund Ins. Co.,* 348 U. S. 310; *Halcyon Lines* v. *Haenn Ship Corp.,* 342 U. S. 282, certainly it should lead us not to upset a practice of the shipping industry sanctioned by the courts most concerned with it.   And if inferences are to be drawn from existing legislation, it may be significant that Congress' careful regulation of freedom to limit liability in the case of public carriers of passengers or cargo (46 U. S. C. §§ 183c, 190–192, 1300–1308) is, either expressly or by virtue of the judicial "gloss" placed upon these sections, inapplicable to the usual tug-tow relationship. This suggests that, in the view of Congress, there is no overriding public policy requiring similar limitations in the field of private towage.

This Court has not, to be sure, in every instance awaited congressional action before imposing views of public policy upon contracting parties.   But it has limited its interference in the field of transportation to relationships between common carriers and their customers, concededly not the relationship before us.   We have held that the towage relationship is even less than one of marine bailment, *Stevens* v. *The White City,* 285 U. S. 195, as to which, under the rulings of the lower fed-

---

conflict among the circuits on the question of validity of the tug-tow exculpatory contracts.   They do not suggest that there is controlling authority in this Court, and tend to support the validity of such exemption.   86 Corpus Juris Secundum (1954) 1038 ("It has been judicially noted that the apparent conflict in authority may arise from failure to use sufficiently unequivocal language in the release clause."); 63 Corpus Juris (1933) 60, § 136 ("it has been said that such question has not yet been authoritatively determined."); 48 American Jurisprudence (1943) 346, § 508 ("Although there are some holdings to the contrary, the weight of judicial opinion seems to favor the view that it is competent for a tower, by a stipulation assented to by the tow, to exempt itself from liability for loss or injury caused by its own negligence.").

eral courts, public policy does not invalidate exculpatory clauses. *Newport News Shipbuilding & Dry Dock Co.* v. *United States,* 34 F. 2d 100 (C. A. 4th Cir.); *Hall-Scott Motor Car Co.* v. *Universal Ins. Co.,* 122 F. 2d 531 (C. A. 9th Cir.); see *International Mercantile Marine S. S. Co.* v. *W. & A. Fletcher Co.,* 296 F. 855, 860 (C. A. 2d Cir.); Restatement, Contracts, §§ 574, 575.

The considerations which have governed this Court's role as arbiter of the public interest in exculpatory contracts were recently enunciated by the unanimous Court in the *Sun Oil* case. They bear repetition:

> "So far as concerns the service to be rendered under the agreement, respondent was not a common carrier or bailee or bound to serve or liable as such. Towage does not involve bailment . . . . There is no foundation in this case for the application of the doctrine that common carriers and others under like duty to serve the public . . . cannot by any form of agreement secure exemption from liability for loss or damage caused by their own negligence. . . . Respondent had no exclusive privilege or monopoly . . . . There is nothing to suggest that the parties were not on equal footing or that they did not deal at arm's length." 287 U. S., at 294.

These considerations of policy are equally present here and call for the result reached in *Sun Oil.*

Nothing in the record hints at any inequality of bargaining power between the parties to this contract, nor is there any basis for taking judicial notice that the tug industry as an industry is in concentrated ownership.[14]

---

[14] There exists no comprehensive study of the towing industry directed to the considerations important in determining whether or not it is characterized by monopolistic tendencies or inequalities of bargaining power. However, a study of transportation lines in the United States prepared by the Corps of Engineers, United States

The towing service was here undertaken by a Government corporation. Certainly we cannot assume that the Government is exploiting the maritime services it is rendering in an unreasonable or coercive manner. Nor was it suggested that no tug company available for the services involved would consent to deletion of the exculpatory clause upon payment of a reasonable consideration. Nor are we informed as to whether such clauses were uniformly found in the standard contracts offered by tug companies in the locality. Had such uniformity of practice been shown, it would not necessarily reflect more than universal satisfaction with such an arrangement; it would hardly demonstrate need for judicial wardship.

The argument is made that permitting the parties to grant immunity to the tug will stimulate irresponsibility, or, at least, that it is necessary to force the tug to bear losses resulting from its negligence in order to provide an

---

Army, lists more than 950 concerns which are described as engaging in towing operations of general or specialized character throughout the United States. See Transportation Lines on the Great Lakes System, 1955 (Transportation Series 3); Transportation Lines on the Mississippi River System and the Gulf Intracoastal Waterway, 1954 (Transportation Series 4); Transportation Lines on the Atlantic, Gulf, and Pacific Coasts, 1954 (Transportation Series 5). In addition, there are numerous towing concerns which operate within a single port not listed in these studies but shown in individual studies of specific ports. Port Series Reports, prepared by the Board of Engineers for Rivers and Harbors. These sources reveal that more than 140 concerns were engaged in towing petroleum products on the Mississippi and Illinois Rivers, or general towage operations on these rivers, which is the service involved in this case. It is impossible to tell how many of these concerns would have been available to petitioner for the services which the Federal Barge Lines rendered. But these rough figures carry no suggestion of the factors which have in the past led us to invalidate clauses relieving from liability for negligence, for they certainly do not warrant an assumption that towage enjoys a monopolistic or comparable economically coercive position.

incentive to reasonable care. In the commercial setting of the towage industry this argument has little force, unless we are prepared also to forbid the tug to insure against such losses or liabilities. If not, then the question ultimately is whether public policy requires that the tug, rather than the tow, shall bear the cost of insurance. Indeed, in all likelihood, the economic burden will fall upon the tow in either case. In the absence of anything in the record, or any facts of which this Court may take judicial notice, that the tug has exploited an unfair bargaining position, there is no reason why the parties should not be free to distribute this cost as they see fit.

It is suggested that a distinction should be drawn between exemption of pilots from liability and exemption of towers. Reliance is placed on the unique position of pilots in the maritime world and the extensive regulation to which they are subjected: they are assimilated to public officers. If the pilotage involved in *Sun Oil* took place in the detailed regulatory context thus suggested, decision in this case should follow *a fortiori* from *Sun Oil* in allowing the agreement of the parties to stand. For quasi-public status and detailed regulation of the qualifications for, and manner of, doing business, with the limited competition which such regulation constrains, are characteristic of the public carrier. If the result in *Sun Oil* was reached despite similarities that brought the situation in proximity to decisions denying common carriers the right to contract against liability for negligence, the absence of these factors here emphasizes the applicability of the analysis of that case to the problem before us.

There is in each of these cases decided today a question of construction of the exculpatory clause. We have noted that the courts have wisely insisted on clear language to avoid the incidents which the law, apart from the voluntary arrangements of the parties, applies to the towage relationship. In the present case, the clause used seems

proof against a construction which would exclude from its operation negligence of the tug. The clause provides that the service is to be done "at the sole risk" of the tow, that the tug is not to be "liable for any loss or damage . . . however occurring" and finally that the master and crew of the tug "shall become and be the servants" of the tow whether or not the tow "assists in the service in any way and irrespective of whether they be aboard . . . or in command" of the tow.[15]

The District Court held that, while the "sole risk" clause did not sufficiently spell out an exemption from liability

---

[15] The clause states in full:

"(4) The movement contemplated will be done at the sole risk of the 'craft to be towed' and its cargo and neither the boats and/or any other equipment used in said service nor the owner, charterer, or hirer thereof shall be liable for any loss or damage to the 'craft to be towed' or its cargo nor for any damage done by the 'craft to be towed,' however occurring. The masters and crews and employees of all boats and/or other equipment assisting the 'craft to be towed' shall, in the performance of said service, become and be the servants of the 'craft to be towed,' regardless of whether the 'craft to be towed' assists in the service in any way and irrespective of whether they be aboard the 'craft to be towed' or in command thereof. Nothing herein contained, however, shall be construed as making the 'craft to be towed,' its owners, charterers or operators liable or responsible for loss of or damage to the property of Federal Barge Lines or third parties or for loss of life or personal injury for which the 'craft to be towed' its owners, charterers or operators would not otherwise be liable or responsible.

"(5) 'Owner' agrees to indemnify and hold harmless Federal Barge Lines from any liability to or for account of the crew of the 'craft to be towed' because of any accident, damage, injury or loss of life to the said crew, or any loss of personal property or effects of the said crew, however arising, and the 'owner' agrees to defend any and all suits or other actions which may be brought against Federal Barge Lines by or for account of the members of such crews for the reasons aforesaid, and to pay, satisfy, or discharge any and all judgments that may be rendered therein, to the full acquittance and discharge of Federal Barge Lines."

for negligence resulting in injury to the tow, the other clause, termed the "pilotage clause," did so. The Court of Appeals held that both reached the liability involved, citing the decision of the Second Circuit in *The Oceanica*. Whether or not the "sole risk" phraseology is sufficiently different from that involved in *The Steamer Syracuse* ("risk") to justify construing it to avoid liability here, the declaration that the tug's personnel are to be considered the servants of the tow, read in context, does manifest an intention that the tug shall not be held liable for injury to the tow. Here the clause makes it clear that the tug's crew are to be regarded as the servants of the tow whether or not there is in fact any direction or control exercised by the tow.

I would affirm.