CONSOLIDATED GRAIN AND BARGE COMPANY, Plaintiff,

v.

GENERAL INTERMODAL LOGISTICS CORPORATION, in personam, and the M/V ANN ELIZABETH, her engines, boilers, tackle, apparel, and furniture, in rem, Defendants and Third-Party Plaintiffs,

v.

HELENA MARINE SERVICE, INC., in personam, and the M/V VICTOR II, her engines, boilers, tackle, apparel, and furniture, in rem, Third-Party Defendants.

No. 81–1303A(4).

United States District Court,
E. D. Missouri, E. D.

Sept. 10, 1982.

Gary T. Sacks, Goldstein & Price, St. Louis, Mo., for plaintiff.

Michael D. O'Keefe, Thompson & Mitchell, St. Louis, Mo., for General Intermodal Logistics.

Samuel T. Vandover, Godfrey, Vandover & Burns, Inc., St. Louis, Mo., for Helena Marine Service, Inc.

## MEMORANDUM

HUNGATE, District Judge.

This admiralty action is before the Court for decision on the merits following a bench trial on July 19 and 20, 1982. Plaintiff Consolidated Grain and Barge Company (Consolidated) seeks monetary damages from defendants General Intermodal Logistics Corporation (GILCO) and the M/V Ann Elizabeth (Ann Elizabeth), alleging that they negligently caused Consolidated's barge CGB 161 to run aground on May 11, 1981. GILCO impleaded defendants Helena Marine Service, Inc. (Helena) and the M/V Victor II (Victor II), alleging that they negligently caused the damage to CGB 161. Helena and the Victor II thereupon counterclaimed against GILCO and the Ann Elizabeth for indemnity or contribution.

The parties stipulated at trial that plaintiff sustained damage in the total amount of $160,439.39 and that, if prejudgment interest were awarded, it should be awarded from October 2, 1981, at a rate of ten percentum (10%) per annum. The parties have also stipulated to a number of other facts by a written stipulation filed July 2, 1982. The stipulations are incorporated into the Court's findings of fact.

Having considered the pleadings, trial testimony, exhibits, stipulations, and memoranda of the parties, and being fully advised in the premises, the Court hereby makes and enters the following findings of facts and conclusions of law.

### Findings of Fact

1. At all material times, Consolidated was a corporation organized and existing under law.

2. At all material times, Consolidated was the owner and/or operator of the unmanned, unpowered, steel-hulled covered hopper barge known as barge CGB 161 and it was the bailee of the cargo laden in the barge. At the time of the casualty, the barge was tight, staunch and in all respects seaworthy.

3. At all material times, GILCO was a corporation duly organized and existing under law and was the owner and employed the crew of the Ann Elizabeth, a river towboat.

4. The Ann Elizabeth is a steel-hulled, diesel-powered river towboat.

5. At all material times, Helena was a corporation duly organized and existing under law and was the owner of the Victor II, a river towboat.

6. The Victor II is a steel-hulled, diesel-powered river towboat.

7. On May 11, 1981, the barge CGB 161 was in tow of the Ann Elizabeth. On that day, while the Ann Elizabeth and its tow were proceeding southbound downriver at Mile 257.7 on the upper Mississippi River, barge CGB 161 and its cargo were damaged when the barge was grounded on a dike. Barge CGB 161 was the lead starboard barge of the tow. The tow consisted of three strings with five loaded barges in each string.

8. The dike upon which barge CGB 161 was grounded was outside the navigable channel.

9. Consolidated sustained damages as a result of the grounding of barge CGB 161 in the amount of $160,438.39.

10. The cause of the grounding was hotly contested at trial. The Court was presented with two mutually exclusive versions of the events leading up to the grounding. GILCO presented evidence showing that as the Ann Elizabeth and tow approached the area of Mile 257.7, the Victor II and tow suddenly and unexpectedly appeared in the navigation channel immediately abreast of the rock dike, thus forcing the Ann Elizabeth and tow to leave the channel in order to avoid colliding with the northbound tow. Helena, however, presented evidence showing that the passing of the two tows occurred without incident, well upriver above the rock dike and that the subsequent grounding was due to either careless navigation or the unseaworthy condition of the Ann Elizabeth itself. Resolution of the causation issue thus clearly depends on the credibility of the witnesses.

11. After carefully considering all of the testimony and the evidence, and having observed the demeanor and manner of the witnesses themselves, the Court concludes that the weight of the more credible evidence establishes that the Victor II and tow were well upriver above the rock dike and in the area of the City of Hamburg at Mile 258.5 when the passing of the two tows was accomplished, that the passing occurred without incident and without embarrassing or interfering with the navigation of the downbound Ann Elizabeth, and that the location of the Victor II and tow did not cause or contribute to the subsequent grounding of the tow by the Ann Elizabeth. The Court further finds as a fact that the proximate cause of the grounding of barge CGB 161 was the negligent navigation of the Ann Elizabeth by her pilot.

12. In making this credibility choice, the Court notes several factors. Of primary importance is the extent to which each party's version of the accident is supported or contradicted by other undisputed facts. The captain of the Ann Elizabeth, Captain Doucet, testified that the Victor II had, in two separate radio conversations prior to the grounding, given its position as being in the area of Sterling Island, at Mile 252, or some five miles below the rock dike; that, in reliance on that position report, the two vessels had agreed to meet and pass in an area approximately two and a half miles below the site of this grounding, and that he (Captain Doucet) did not become aware of the presence and location of the Victor II abreast of the rock dike until he was less than one-half mile above the dike. At that time, according to Captain Doucet, he brought his engines full astern and made every effort to stop his tow, but was unable to do so before colliding with the rock dike. Captain Doucet also testified that following the grounding, Captain Hamilton on the Victor II told him that the Victor II's pilot was not "posted on" (i.e., not familiar with) the upper Mississippi River and that he has gotten confused about the Victor II's location.

Captain Doucet's testimony, however, is impeached on material points by many of the other witnesses (including the Ann Elizabeth's pilot, Hasson, and the Ann Elizabeth's mate, Mathews), and by the documentary evidence introduced at trial. GILCO Exhibit B, a copy of the official U. S. Corps of Engineers river navigation map, shows that the pilot on a southbound vessel would have a clear view of any vessels in the area of or below Mile 257.7 as soon as

the southbound vessel reached a point above Mile 260, or over two miles above the rock dike. This fact was supported by Pilot Hasson who testified that the navigable channel in and below the rock dike is, in fact, clearly visible to a southbound pilot at least two miles above it.

It is difficult for this Court to credit Captain Doucet's testimony that he was unaware of the presence of the Victor II and tow until shortly before this grounding. Rather, the evidence demonstrates that had the Victor II and tow been in a bad location for passing, this would have been known to Captain Doucet some two miles above the site of the casualty, which, according to the testimony of Pilot Hasson, would have been sufficient to permit the Ann Elizabeth to stop and avoid the collision.

Captain Doucet's credibility was also put into question by his admission that at the time of the accident, he was on probation with the Coast Guard with respect to his pilot's license.

13. Additionally, for the Court to give credence to GILCO's version of the accident, the Court must find that both Captain Hamilton and Pilot Keesey on the Victor II were unfamiliar with this area, i.e., "not posted," and that both reported the position of the Victor II and tow erroneously. The Court notes, however, the presence of numerous government-built landmarks in this area, clearly showing the exact river mileage location. Additionally, Pilot Keesey testified that he had spent the last six years exclusively navigating on the upper Mississippi River and through this area; that he had navigated the area hundreds of times and was totally familiar with all the landmarks, islands, lights, and day marks, and that he knew exactly where he was at all times and never communicated an erroneous position to the Ann Elizabeth. Captain Hamilton's testimony likewise showed that he was very familiar with this area of the river. GILCO's version that the Victor II reported its position well below the dike at Mile 257.7 is also refuted by the entries made in the Victor II's captain's log (Helena Exhibit 3A), showing that the Victor II recorded its position at or near Mile 257 at 6:00 a. m., some one-half hour before the time which, according to Captain Doucet, the accident occurred.

14. The Court finds Helena's position that the accident occurred after the Victor II had passed the Ann Elizabeth, and was caused by Captain Doucet's negligent navigation, to be the more credible explanation. Captain Hamilton testified that he and Captain Doucet agreed that the Victor II would pull into Hamburg Harbor, above Mile 257.-7, to let the Ann Elizabeth pass, and that the passing occurred as agreed. J. T. Mathews, the mate of the Ann Elizabeth, testified that he was in the pilothouse on the Ann Elizabeth at the time the passing occurred, and that, at that time, the Victor II and tow were in the area of Hamburg and that the passing occurred without incident. He also related that as the Ann Elizabeth and tow proceeded on downriver, he and Captain Doucet were talking when, suddenly, Captain Doucet noticed that the Ann Elizabeth's tow was outside of the black buoy which marks the right descending side of the channel and the outriver end of the rock dike. At that time, according to Mathews, Captain Doucet came full ahead on the engines and attempted, unsuccessfully, to steer the tow back into the channel.

This version of the accident is supported by Consolidated's claim manager, Charles Hooley, who testified that following the accident, he spoke with a man who identified himself as the captain of the Ann Elizabeth over the radio, and was told that the grounding occurred because the Ann Elizabeth "just didn't have enough punch to overcome the set." The engine room logs of the Ann Elizabeth indicate, contrary to Captain Doucet's testimony, that the grounding occurred when the engines were full ahead.

15. GILCO attempted to impeach the testimony of Mathews by proof that he signed a statement to the effect that he "knew nothing" about the casualty and was below deck at the time it occurred. The Court finds this evidence insufficient to defeat the basic credibility of Mathews as a

witness. That Mathews was in the pilothouse with Captain Doucet is shown by the testimony of not only Mathews, but of Captain Doucet and of deckhand Rayburn who was also present. The Court also notes that this was a statement which was prepared by representatives of GILCO and mailed to Mathews' home where Mathews signed it and mailed it back to GILCO's representatives. Given the other evidence that Mathews was present in the pilothouse and was aware of the circumstances surrounding this casualty, the Court disregards the impeaching statement to the contrary.

16. The Court thus finds as a fact, based on the more credible testimony of Captain Hamilton, Mr. Mathews, Pilot Keesey, and Mr. Hooley, that the Victor II and tow were well above this rock dike at Mile 257.7 at the time the two vessels passed, and was in a safe and proper location for passing and, therefore, did not impede or embarrass the navigation of the downbound Ann Elizabeth.

17. The Court further finds as a fact that the grounding of barge CGB 161 was caused by the negligence of Captain Doucet in allowing the Ann Elizabeth and its tow to come too close to the left descending bank just above Mile 257.7, so that the tow was pulled out of the navigational channel and into the rock dike at Mile 257.7, or that the grounding was caused by the unseaworthiness of the Ann Elizabeth in that her engines were not at the proper operating capacity to permit it to avoid the grounding, or both.

18. At the time of the grounding on May 11, 1981, there was in effect a written agreement between Consolidated and GILCO. (GILCO Exhibit E.) Under this agreement, entitled "Charter Party Agreement," Consolidated hired the Ann Elizabeth from GILCO "with a full compliment of Master, Officer and Crew ... all of whom shall be the agents and employees of Owner [GILCO]." Under the agreement and the practice of the parties, Consolidated had the exclusive use of the Ann Elizabeth and gave it orders regarding when and where to transport Consolidated's barges.

Consolidated also fueled the Ann Elizabeth, and provided it with a list of towing services it was to use for assistance. GILCO hired, fired, paid, and controlled the Ann Elizabeth's crew. The methods of navigation were determined by GILCO through the Ann Elizabeth's crew. Paragraph 15 of the agreement, entitled "Exceptions," provides in pertinent part that:

[t]he towing vessel, its Master and Owner shall not, unless otherwise expressly provided, be responsible for any loss or damage arising or resulting from: any act, neglect, default or barratry of the Master, pilots, mariners or other servants of the Owner in the navigation or management of the towing vessel; ... collision, stranding, or peril, danger or accident of navigable waters; ... unseaworthiness of the towing vessel unless caused by want of due diligence on the part of the Owner to make the towing vessel seaworthy ....

### Conclusions of Law

1. This action is within the admiralty and maritime jurisdiction of this Court, and the claims stated are admiralty and maritime claims within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure.

2. The grounding of a tow outside the navigable channel gives rise to a presumption of negligence on the part of the towing vessel. *Mid America Transportation Company, Inc. v. National Marine Service, Inc., et al.,* 497 F.2d 776 (8th Cir. 1974). GILCO has failed to rebut this presumption.

3. The proximate cause of the grounding of barge CGB 161 was the negligent navigation of the Ann Elizabeth by Captain Doucet.

4. Helena and the Victor II did not embarrass the navigation of the Ann Elizabeth, were not negligent, and did not violate any laws, statutes, duties, or rules under the facts of this case.

5. GILCO's assertions that it is not liable for the negligence of Captain Doucet because this was a demise charter or

because of the exculpatory language of paragraph 15 are unpersuasive. "To create a demise the owner of the vessel must completely and exclusively relinquish 'possession, command, and navigation' thereof to the demisee." *Guzman v. Pichirilo,* 369 U.S. 698, 699, 82 S.Ct. 1095, 1096, 8 L.Ed.2d 205 (1962). GILCO did not so relinquish these rights. The rule of *Bisso v. Indand Waterways Corporation,* 349 U.S. 85, 75 S.Ct. 629, 99 L.Ed. 911 (1955), voids the exculpatory provision of paragraph 15 in this contract of towage.

6. GILCO is liable, *in personam,* and the Ann Elizabeth is liable, *in rem,* for Consolidated's damages in the amount of $160,438.39.

7. GILCO is also liable, *in personam,* and the Ann Elizabeth is also liable, *in rem,* for prejudgment interest from October 2, 1981, at the rate of ten percentum (10%) per annum on the amount of damages. Prejudgment interest in admiralty cases should be granted unless there are exceptional or peculiar circumstances. *Mid-America Transportation Co., Inc. v. Rose Barge Line, Inc.,* 477 F.2d 914, 916 (8th Cir. 1973). The Court rejects GILCO's argument that Consolidated is not entitled to prejudgment interest for the time after which Consolidated's insurance carrier had compensated Consolidated for its loss. Such compensation is neither exceptional nor peculiar.

> The rule is that, in the absence of timely objection on the part of the defendant, the party suffering the loss may maintain an action for recovery of the whole loss against the party primarily liable, although the plaintiff has been indemnified for part of his loss and the indemnifier, to the extent of the payment made, has been subrogated to the plaintiff's rights against the person primarily liable.

*National Garment Co. v. New York Central and St. Louis Railway Co.,* 173 F.2d 32, 34 (8th Cir. 1949).

8. The Court therefore finds that judgment should be entered in favor of Consolidated and against GILCO in the sum of One Hundred Sixty Thousand Four Hundred Thirty-Eight and 39/100 Dollars ($160,438.39), with prejudgment interest on said amount commencing October 2, 1981. The Court enters judgment in favor of Helena and against GILCO on GILCO's third party complaint and the counterclaim of Helena against GILCO will be dismissed as moot. All costs shall be taxed against GILCO.